693 A.2d 417

RAYMOND ARTHUR ABBOTT, A MINOR, BY HIS GUARDIAN AD LITEM, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FIGUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA, AND VIVIAN FIGUEROA, MINORS, BY THEIR GUARDIAN AD LITEM, BLANCA FIGUEROA; MICHAEL HADLEY, A MINOR, BY HIS GUARDIAN AD LITEM, LOLA MOORE; HENRY STEVENS, JR., A MINOR, BY HIS GUARDIAN AD LITEM, HENRY STEVENS, SR.; CAROLINE JAMES AND JERMAINE JAMES, MINORS, BY THEIR GUARDIAN AD LITEM, MATTIE JAMES; DORIAN WAITERS AND KHUDAYJA WAITERS, MINORS, BY THEIR GUARDIAN AD LITEM, LYNN WAITERS; CHRISTINA KNOWLES, DANIEL KNOWLES, AND GUY KNOWLES, JR., MINORS, BY THEIR GUARDIAN AD LITEM, GUY KNOWLES, SR.; LIANA DIAZ, A MINOR, BY HER GUARDIAN AD LITEM, LUCILA DIAZ; AISHA HARGROVE AND ZAKIA HARGROVE, MINORS, BY THEIR GUARDIAN AD LITEM, PATRICIA WATSON; AND LAMAR STEPHENS AND LESLIE STEPHENS, MINORS, BY THEIR GUARDIAN AD LITEM, EDDIE STEPHENS, PLAINTIFFS–MOVANTS, v. FRED G. BURKE, COMMISSIONER OF EDUCATION; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET AND ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; AND NEW JERSEY STATE BOARD OF EDUCATION, DEFENDANTS–RESPONDENTS.

Argued March 4, 1997—Decided May 14, 1997.

148

*David G. Sciarra* and *Paul L. Tractenberg* argued the cause for movants (*Mr. Sciarra*, attorney; *Mr. Sciarra*, *Mr. Tractenberg*, *Lawrence S. Lustberg*, and *James E. Ryan*, on the briefs).

*Peter Verniero*, Attorney General of New Jersey, argued the cause for respondents (*Mr. Verniero*, attorney; *Jaynee LaVecchia*, Assistant Attorney General, of counsel; *Nancy Kaplen*, *Michelle Lyn Miller*, and *Peter D. Wint*, Deputy Attorneys General, on the briefs).

*Douglas S. Eakeley* argued the cause for amicus curiae The League of Women Voters of New Jersey (*Lowenstein, Sandler, Kohl, Fisher & Boylan*, attorneys; *Mr. Eakeley* and *Marjorie A. Adams*, on the brief).

*Denise Mullens Carter* argued the cause for amicus curiae New Jersey Black Issues Convention, Inc. (*Roche & Carter*, attorneys).

*Cecilia M. Zalkind* submitted a brief on behalf of amicus curiae Association for Children of New Jersey (*Ms. Zalkind*, attorney;

*H. Kit Ellenbogen, Nancy D. Feldman,* and *Cynthia C. Rice,* on the brief).

*Paulette Brown* submitted a brief on behalf of amicus curiae Black Ministers Council of New Jersey (*Brown Lofton Childress & Wolfe,* attorneys).

*Richard A. Friedman* submitted a brief on behalf of amicus curiae New Jersey Education Association (*Zazzali, Zazzali, Fagella & Nowak,* attorneys; *Mr. Friedman* and *Aileen M. O'Driscoll,* on the brief).

*David H. Coates* and *Vincent C. DeMaio* submitted a brief on behalf of amicus curiae Foundation Aid Districts Association (*Turp, Coates, Essl & Diggers* and *DeMaio & DeMaio, attorneys*).

*Ronald I. Bloom* submitted a brief on behalf of amicus curiae Galloway Township (*Vasser, Spitalnick & Bloom,* attorneys).

*Joseph Charles, Jr.,* submitted a brief on behalf of amicus curiae New Jersey Legislative Black and Latino Caucus.

*Michelle Hollar-Gregory,* Corporation Counsel, submitted a brief on behalf of amicus curiae City of Newark.

*Eugene G. Liss* submitted a brief on behalf of amicus curiae Newark Teachers Union, Local 481 A.F.T., A.F.L.-C.I.O.

*Victor E.D. King* submitted a brief on behalf of amicus curiae Board of Education of the City of Plainfield, Union County (*King, King and Goldsack,* attorneys). ˙

*Margaret C. Murphy,* Counsel, submitted a brief on behalf of amicus curiae New Jersey Association of School Administrators.

*Cynthia J. Jahn,* Director, Legal Department, submitted a brief on behalf of amicus curiae New Jersey School Boards Association (*Ms. Jahn,* attorney; *Michael F. Kaelber* and *Donna M. Kaye,* on the brief).

*Stephen Eisdorfer* submitted a statement in lieu of brief on behalf of amici curiae Middlesex Somerset Mercer Regional Council, Affordable Housing Network of New Jersey, Association of New Jersey Environmental Commissions, Civic League of Greater New Brunswick, Isles, Inc., New Jersey Chapter of the American

Planning Association, and New Jersey Environmental Lobby (*Hill Wallack*, attorneys).

The opinion of the Court was delivered by

HANDLER, J.

Plaintiffs are children attending public schools in school districts located in poor urban areas, classified as "special needs districts." For many years they have been denied their constitutional right to a thorough and efficient education. We previously held that in the absence of legislation that would assure a constitutionally adequate education, these school children are entitled to judicial relief directed toward the improvement of the educational opportunity available to them.

Plaintiffs contend that recently-enacted legislation, the Comprehensive Educational Improvement and Financing Act of 1996, fails to assure them a thorough and efficient education. They seek by motion, in this action, the judicial relief to which they are entitled. The act prescribes educational standards that define and assess a thorough and efficient education. The act also provides funding for both regular education, as defined by the educational standards, and supplemental programs that are essential to a thorough and efficient education in the special needs districts. The State claims that the Comprehensive Educational Improvement and Financing Act is a new and comprehensive approach to public education that provides children in the special needs districts with the opportunity to achieve a thorough and efficient education, and thus obviates the need for judicial relief.

The Comprehensive Educational Improvement and Financing Act may someday result in the improvement of the educational opportunity available to all New Jersey public school students. We conclude, however, that the new act is incapable of assuring that opportunity for children in the special needs districts for any time in the foreseeable future. Although the educational content standards prescribed by the new act are an essential component of a thorough and efficient education, the primary infirmity of the

new act inheres in its funding provisions that fail to assure expenditures sufficient to enable students in the special needs districts to meet those standards. Furthermore, the supplemental aid provided by the new act bears no demonstrable relationship to the real needs of the disadvantaged children attending school in the special needs districts. Those needs must be met to provide students in the deprived districts with the opportunity to achieve a thorough and efficient education.

We hold that the Comprehensive Educational Improvement and Financing Act of 1996 is unconstitutional as applied to the special needs districts. The remedial relief that we order is directed to those constitutional deficiencies. We do not disturb the substantive and performance educational standards. In the absence of adequate funding realistically geared to such educational standards, however, we require that funding for regular education in the special needs districts be increased and that measures be taken to assure the proper and efficient use of expenditures to maximize educational resources and benefits in those districts. We further order the State to study, identify, fund, and implement the supplemental programs required to redress the disadvantages of public school children in the special needs districts.

I

The New Jersey Constitution mandates that:

The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.

[*N.J. Const.* art. VIII, § 4.]

Since 1973, students in poor urban school districts have sought fulfillment of that constitutional right.[1] This action began in 1981, when children attending public schools in Camden, East Orange,

---

[1] *See Robinson v. Cahill,* 62 *N.J.* 473, 303 A.2d 273 (1973) (*Robinson I*); *Robinson v. Cahill,* 63 *N.J.* 196, 306 A.2d 65 (*Robinson* II), *cert. denied,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973); *Robinson v. Cahill,* 67 *N.J.* 35, 335 A.2d 6 (1975) (*Robinson* III); *Robinson v. Cahill,* 69 *N.J.* 133, 351 A.2d 713 (1975) (*Robinson IV*), *cert. denied,* 423 *U.S.* 913, 96 *S.Ct.* 217, 46 *L.Ed.*2d 141

Irvington, and Jersey City filed a complaint in the Superior Court, Chancery Division, challenging the constitutionality of the Public School Education Act of 1975 (1975 Act). *L.* 1975, *c.* 212 (codified at *N.J.S.A.* 18A:7A–1 to—33 (repealed)).

In September 1983, following extensive pretrial discovery proceedings in the case challenging the 1975 Act, defendants filed a motion to dismiss the complaint on the ground that plaintiffs had failed to exhaust their administrative remedies.[2] That motion was granted in November 1983. Plaintiffs filed a notice of appeal, and following our order denying direct certification, the Appellate Division reversed the trial court's decision and remanded the case for a plenary hearing. *Abbott v. Burke,* 195 *N.J.Super.* 59, 477 *A.*2d 1278 (1984). We granted defendants' petition for certification, 97 *N.J.* 669, 483 *A.*2d 187 (1984), and rendered our first decision in this action. *Abbott v. Burke,* 100 *N.J.* 269, 495 *A.*2d 376 (1985) (*Abbott* I).

In *Abbott* I, we determined that the ultimate constitutional issues were especially fact-sensitive and related primarily to specialized areas of education and administrative expertise. *Id.* at 301, 495 *A.*2d 376. Accordingly, we concluded that the issues should be resolved only on the basis of a comprehensive factual record. *Ibid.* We remanded the matter to the Commissioner of Education (the Commissioner). *Ibid.* Because the Commissioner was a defendant in *Abbott* I, however, we ordered that the initial hearing and fact-finding take place before an Administrative Law Judge (ALJ). *Id.* at 302, 495 *A.*2d 376.

On August 24, 1988, after extensive hearings and other proceedings spanning a period of over eight months, the ALJ issued a lengthy decision that concluded

---

(1975); *Robinson v. Cahill,* 69 *N.J.* 449, 355 A.2d 129 (1976) (*Robinson* V); *Robinson v. Cahill,* 70 *N.J.* 155, 358 A.2d 457 (1976) (*Robinson* VI); *Robinson v. Cahill,* 70 *N.J.* 464, 360 A.2d 400 (1976).

[2] Defendants are the Commissioner of Education, the Director of Budget and Accounting, the State Treasurer, and the State Board of Education.

that evidence of substantial disparities in educational input (such as course offerings, teacher staffing, and per pupil expenditures) were related to disparities in school district wealth; that the plaintiffs' districts, and others, were not providing the constitutionally mandated thorough and efficient education; that the inequality of educational opportunity statewide itself constituted a denial of a thorough and efficient education; that the failure was systemic; and that the statute and its funding were unconstitutional.

> [*Abbott v. Burke*, No. EDU 5581–88 (OAL 1988) (ALJ Decision) (*quoted in Abbott v. Burke*, 119 *N.J.* 287, 297, 575 *A.*2d 359 (1990) (*Abbott* II)).]

The Commissioner declined to accept the ALJ's recommendations, and the State Board of Education (State Board) affirmed the Commissioner's determination.

We directly certified plaintiffs' appeal. 117 *N.J.* 51, 563 *A.*2d 818 (1989). On June 5, 1990, we reversed the decision of the State Board and declared the 1975 Act unconstitutional as applied to twenty-eight poorer urban districts classified within District Factor Groups (DFGs) A & B.[3] *Abbott* II, *supra*, 119 *N.J.* 287, 575 *A.*2d 359. We compared at length the quality of education delivered in those special needs districts (SNDs) with the education delivered in the more affluent DFG I & J districts and concluded that the SNDs uniformly provided an inferior educational opportunity. *Id.* at 357–68, 575 *A.*2d 359. We determined that "the level of education offered to students in some of the poorer urban districts is tragically inadequate. Many opportunities offered to students in richer suburban districts are denied them." *Id.* at 359, 575 *A.*2d 359.

---

[3] In 1974, the Department of Education (DOE) divided the state's school districts by socioeconomic status. *Abbott* II, *supra*, 119 *N.J.* at 384–85, 575 *A.*2d 359. Districts were arranged in ten groups, known as District Factor Groups, and designated DFG A through DFG J, A being the group with the lowest socioeconomic status and J the highest. *Id.* at 385, 575 *A.*2d 359. Another statistical category adopted by the DOE was the "urban district." *Id.* at 386, 575 *A.*2d 359. In 1990, there were fifty-six such districts. *Ibid.* Of the fifty-six urban districts, those in DFG A & B had the strongest characteristics of poverty and need. *Ibid.* As such, those districts were denominated special needs districts. In subsequent proceedings, those districts sometimes are referred to as "SNDs."

We adopted substantially the material factual findings made by the ALJ, including determinations that: poorer urban districts could not offer important courses; the SNDs provided a deficient education in many essential curriculum areas; and the SNDs operated schools that, due to their age and lack of maintenance, were crumbling and did not provide an environment in which children could learn. *Id.* at 359–63, 575 *A.*2d 359.

We also considered the special needs of the children in the SNDs, needs that palpably undercut their capacity to learn; we found those needs to be vastly greater than any extra-educational needs of the students in the DFG I & J districts:

> The difference is monumental, no matter how it is measured. Those needs go beyond educational needs, they include food, clothing and shelter, and extend to lack of close family and community ties and support and lack of helpful role models. They include the needs that arise from a life led in an environment of violence, poverty, and despair. Urban youth are often isolated from the mainstream of society. Education forms only a small part of their home life, sometimes no part of their school life, and the dropout rate is almost the norm.... The goal is to motivate them, to wipe out their disadvantages as much as a school district can, and to give them an educational opportunity that will enable them to use their innate ability.
>
> [*Id.* at 369, 575 *A.*2d 359.]

We concluded that "in order to achieve the constitutional standard for the student[s] from these poorer urban districts—the ability to function in that society entered by their relatively advantaged peers—the totality of the districts' educational offering must contain elements over and above those found in the affluent suburban district." *Id.* at 374, 575 *A.*2d 359.

Responding both to the disparity in regular education funding and the special needs of children attending school in the SNDs, we formulated a two-part approach for remediating the constitutional deprivation. We first ordered that "[t]he Act must be amended, or new legislation passed, so as to assure that poorer urban districts' educational funding is substantially equal to that of property-rich districts." *Id.* at 384, 575 *A.*2d 359. To that end, we required that the assured per-pupil funding in the poorer urban districts should be substantially equivalent to that spent in those districts providing the kind of education that those students

needed—funding that approximated the average net expense budget of school districts in DFGs I & J. *Id.* at 386, 575 *A.*2d 359. We further ordered that "[t]he level of funding must also be adequate to provide for the special educational needs of these poorer urban districts in order to redress their extreme disadvantages." *Id.* at 295, 575 *A.*2d 359.

Implementation of the remedy for the constitutional violation was left to the Legislature. We made clear, however, that the remedy could not depend on how much a poorer urban school district was willing to tax itself. *Id.* at 386, 575 *A.*2d 359. We also stated that the Legislature could choose to equalize per-pupil expenditures for all districts at any level that it determined would achieve a thorough and efficient education—the level did not necessarily have to be the average of the affluent suburban districts. *Id.* at 387, 575 *A.*2d 359.

In response to *Abbott* II, the Legislature enacted the Quality of Education Act of 1990(QEA). *L.* 1990, *c.* 52 (codified at *N.J.S.A.* 18A:7D–1 to –37 (repealed)). The QEA specified that for the 1991–1992 school year, the cost of a "quality education" would be $6,640 per elementary school pupil (the foundation amount). *N.J.S.A.* 18A:7D–6(b) (repealed). The act also purported to provide for equalized per-pupil expenditures.

Under the QEA, equalized per-pupil expenditures would be achieved by increasing State aid to the SNDs, while restricting State aid to the DFG I & J districts until the respective per-pupil expenditures were substantially the same. The QEA increased the amount of State aid to the SNDs through the use of a multiplier, termed the special needs weight, that applied only to those districts. Thus, for the first year of the QEA, the special needs weight added five percent to the amount of education aid an SND would receive from the State. *N.J.S.A.* 18A:7D–6 (repealed). The five-percent weight was an arbitrarily assigned number in that, as stipulated by the parties, the Legislature selected that percentage without relying on any study of the level of funding actually needed for the SNDs to achieve parity. The QEA

authorized the Governor to increase the special needs weight, subject to the Legislature's disapproval. *N.J.S.A.* 18A:7D–13 (repealed). The special needs weight was the mechanism that theoretically would have enabled the SNDs to increase their budgets beyond the foundation amount to achieve parity with the wealthier districts.

The QEA also addressed that part of the *Abbott* remedy dealing with special, extra-educational needs by creating a new aid program for the at-risk students in the SNDs. *N.J.S.A.* 18A:7D–32 (repealed). At-risk aid was calculated by multiplying the State foundation aid amount by the number of "pupil units" for at-risk students. The number of pupil units was determined by multiplying the number of students eligible for free meals or milk under the National School Lunch Act or the Child Nutrition Act of 1966 by a legislatively-determined factor termed the at-risk weight. *N.J.S.A.* 18A:7D–3, –20 (repealed). As with the special needs weight, the at-risk weights were chosen arbitrarily in that the Legislature did not perform any study of the additional costs associated with providing services to at-risk children.

On June 12, 1991, plaintiffs made an application for this Court to assume jurisdiction and to declare the QEA unconstitutional on its face. The Court declined to hear the matter directly but remanded it to the Chancery Division.

On August 31, 1993, the Chancery Division, in an unpublished opinion, held that the QEA failed to assure that funding for regular education in the thirty SNDs would be substantially similar to that of the DFG I & J districts within a reasonable time period.[4] *Abbott v. Burke,* No. 91–C–00150, 1993 WL 379818, at *14 (N.J. Ch. Div. Aug. 31, 1993). The court also determined that the at-risk aid program was insufficient to address the special needs of disadvantaged children identified in *Abbott* II. *Ibid.*

---

[4] The QEA added two additional districts—Neptune and Plainfield—to the 28 SNDs previously identified by this Court. *N.J.S.A.* 18A:7D–3 (repealed).

We affirmed the judgment of the Chancery Division and declared the QEA unconstitutional as applied to the special needs districts. *Abbott v. Burke*, 136 *N.J.* 444, 643 *A.*2d 575 (1994) (per curiam) (*Abbott* III). We found the QEA unconstitutional because of its "failure to assure parity of regular education expenditures between the special needs districts and the more affluent districts," *id.* at 446–47, 643 *A.*2d 575, and because of its failure adequately to address the unique needs of children in the SNDs, *id.* at 452–54, 643 *A.*2d 575.

The basic deficiency in the QEA in relation to regular education was its failure to tie the amount that an SND would have to spend to achieve parity, referred to as the equity spending cap, to the amount of State aid the district would receive. *Id.* at 451, 643 *A.*2d 575. We recognized that the QEA theoretically could permit, through the equity spending cap, and pay for, through increases in the special needs weight, substantial equivalence. We found, however, that such a result would depend on discretionary action and "fail[ed] to guarantee adequate funding for [the special needs] districts." *Ibid.*

The basic deficiency in the at-risk component of the QEA was its failure to meet the special, extra-educational needs of the children in the SNDs. We reiterated our holding in *Abbott* II:

[S]tudents in the special needs districts have distinct and specific requirements for supplemental educational and educationally-related programs and services that are unique to those students, not required in wealthier districts, and that represent an educational cost not included within the amounts expended for regular education.

[*Id.* at 453–54, 643 *A.*2d 575.]

We also expressed our concern about the "need for supervision of the use of additional funds for the special needs districts, and the need for the State to identify and implement supplemental programs and services targeted to the needs of school children in the special needs districts." *Id.* at 451, 643 *A.*2d 575. We found that the Commissioner had failed to study which programs and services were needed to aid disadvantaged students as required by *Abbott* II. *Id.* at 453, 643 *A.*2d 575. We further determined that the QEA's at-risk weights were not based on any study of the

actual costs associated with providing services to at-risk students. *Ibid.* Lastly, we found that there was no mechanism in place to control, regulate, or monitor the use of the additional funding made available to the SNDs under the act. *Id.* at 451, 643 *A.*2d 575.

Notwithstanding the conclusion that the statute was constitutionally deficient, we declined to direct any immediate, affirmative remedial relief. We withheld relief because there had been a substantial increase in State aid to the thirty special needs districts since the *Abbott* II decision.[5] *Id.* at 447, 643 *A.*2d 575. Consequently, we declared that we would not intervene on behalf of the plaintiffs if the State achieved "substantial equivalence" in funding between property-rich and property-poor districts by the 1997–1998 school year and provided for the special educational needs of students in the SNDs. *Ibid.* If, however, "a law assuring such substantial equivalence, approximating 100%, for school year 1997–1998 and providing as well for special educational needs is not adopted by September 1996," we indicated that we would consider applications for relief. *Id.* at 447–48, 643 *A.*2d 575.

In April 1996, plaintiffs filed a Motion in Aid of Litigants' Rights contending that the State had failed to discharge its duty to "further address" the sixteen-percent relative disparity in funding and that the State would fail to provide sufficient supplemental programs for the special needs districts. On September 10, 1996, we denied the motion because the Legislature was actively considering legislation to address its obligation to effectuate the thorough and efficient clause. We denied the motion "without prejudice to its renewal should the Legislature and the Governor fail to enact appropriate legislation on or before December 31, 1996." The Comprehensive Educational Improvement and Financing Act of 1996 (CEIFA), *L.* 1996, *c.* 138 (codified at *N.J.S.A.* 18A:7F–1

---

[5] Before *Abbott* II, the SNDs had expended between 70% and 75% of the amount expended by the wealthier districts on regular education. *Abbott* III, *supra,* 136 *N.J.* at 447, 643 *A.*2d 575. At the time of the *Abbott* III decision, the SNDs were spending 84% of the amount spent by the wealthier districts. *Ibid.*

to –33), is the legislative response to *Abbott* III. After its passage, plaintiffs renewed their motion.

II

CEIFA embodies the legislative determination that a thorough and efficient education can be provided to every public elementary, middle, and high school student in New Jersey in accordance with specific substantive standards that define the content of a constitutionally sufficient education and in accordance with performance assessments that measure levels of educational achievement. The substantive requirements are specified by the core curriculum content standards (content standards or standards), and are intended to implement the thoroughness component of the constitutionally mandated thorough and efficient education.

The substantive educational standards are the centerpiece of the new statute. They were first proposed by the Governor in January 1995, along with an expanded student assessment program that would monitor the progress of students at grades four, eight, and eleven. The formulation process began in February 1995. Several draft versions of the standards were disseminated prior to May 1, 1996, when the Department of Education formally adopted them. *See Core Curriculum Content Standards* (May 1996). The standards provide achievement goals applicable to all students in seven core academic areas: visual and performing arts, comprehensive health and physical education, language-arts literacy, mathematics, science, social studies, and world languages.[6] Infused throughout the seven core academic areas are five "cross-content workplace readiness standards," which are designed to incorporate career-planning skills, technology skills, critical-thinking skills, decision-making and problem-solving skills, self-management, and safety principles. The standards are not a curriculum; rather, they define the results expected without pre-

---

[6] The seven academic areas contain 56 specific curriculum standards and 880 "student progress indicators."

scribing specific strategies or educational methodologies to ensure that students actually meet those expectations. The development of a curriculum to deliver the educational achievement levels required by the standards is left to the local districts.[7]

Performance indicators are also incorporated in the act. An improved statewide assessment program, based on the standards, is scheduled to be phased in over the next six years. At present, New Jersey students are not evaluated by the State prior to the eighth-grade level; under the proposed system, students will be evaluated at the fourth-grade level (the Elementary School Proficiency Assessment, or "ESPA"), the eighth-grade level (the Early Warning Test, or "EWT"), and the eleventh-grade level (the High School Proficiency Test, or "HSPT"). The proposed evaluation system is essential to the success of the standards-based approach effectuated by CEIFA, for it is designed to measure student progress toward achievement of the substantive standards and to provide educators and administrators with the information necessary to take corrective action in those areas where students are failing to achieve at the prescribed levels.[8]

---

[7] The DOE is in the process of developing "curriculum frameworks" for all seven academic areas covered by the standards. Local districts are expected, but not required, to use those curriculum frameworks as a resource in the development of a curriculum that will enable students to achieve at the levels contemplated by the standards and embodied in the statewide evaluations.

[8] It will be several years before the evaluation system is in place, and even longer before data can be compiled and assessed regarding student achievement levels. The Court was informed at oral argument that the fourth-grade ESPA will be "field tested" this May and that the field test will cover less than half of the material contained in the standards. We were further informed that the State expects to test all fourth-graders in all core subject areas within five years. The State plans gradually to update the eighth-grade EWT and the eleventh-grade HSPT: one year after a subject area is assimilated into the fourth-grade ESPA, it will be tested as part of the eighth-grade EWT and the eleventh-grade HSPT. Thus, social studies is scheduled to be "field tested" in the 1999 ESPA, and operationally tested at that level in 2000; the social-studies standards, therefore, should be tested at the eighth and eleventh-grade levels for the first time in 2001.

CEIFA includes funding provisions that purport to implement the efficiency component of the constitutional thorough and efficient education. The statute determines that the educational opportunity, as defined by the standards, can and should be provided at a fixed per-pupil cost. The prescribed amount, referred to as the "T & E amount," purports to be the cost that is sufficient to ensure that a thorough and efficient education may be achieved in all districts. Unlike the QEA, which ascribed an arbitrary per-pupil cost for a "quality education" that was not defined, CEIFA correlates educational funding with educational achievement through the T & E amount. Expenditures in excess of the prescribed T & E amount are deemed to be unnecessary to achieve a thorough and efficient education. The funding provisions of CEIFA remain the central focus of our constitutional inquiry because they determine the types and amounts of resources that will be available to enable students to achieve a thorough and efficient education, as defined by the content standards.

The fiscal standards were developed simultaneously with the content standards. The funding scheme is derived from a hypothetical school district that serves as the model for all school districts. The model district contains an elementary school of 500 students, a middle school of 675 students, a high school of 900 students, and a district central office. The model is based on assumptions about the number of teachers, teacher's aides, instructional minutes, professional and technical staff, administrative staff, textbooks, supplies, and equipment required to provide and to deliver efficiently an education conforming to the content standards. The Commissioner then determined, based on statewide averages, the actual costs of those educational inputs. The final step was to apply the actual costs to the assumed efficient level of inputs. The DOE released the final efficiency standards derived from the model school district in May 1996. *Comprehensive Plan for Educational Improvement and Financing* (May 1996) ("May 1996 Plan").

Based on the final content standards and the final fiscal provisions, the DOE concluded that it would cost $6,720, plus or minus $336,[9] to provide the constitutionally required educational opportunity to every New Jersey elementary school pupil in 1997–1998.[10] That number, the T & E amount, was incorporated by the Legislature into CEIFA. *See N.J.S.A.* 18A:7F–12. Both the T & E amount and the flexible amount will be adjusted by the CPI for the 1998–1999 school year, and established biennially by the Commissioner thereafter. *Ibid.*

The T & E amount is neither the minimum nor the maximum amount that a school district is permitted to spend per-pupil. *See N.J.S.A.* 18A:7F–5(d). Like all of the predecessor statutes, CEIFA requires each school district to raise locally a portion of the per-pupil expenditure. Similar to the QEA, the required local share under CEIFA is dependent on local property taxes. It is calculated based on local district property wealth and the average income of district taxpayers; in short, the required local share is based on the districts' ability to pay. *N.J.S.A.* 18A:7F–5(b). State aid makes up the difference between the required local share and the T & E amount (multiplied by student enrollment). Every district is permitted to raise locally and to spend in excess of the T & E amount, but a district's total budget may not increase from its prior year's budget by more than the "spending growth limitation." [11] *N.J.S.A.* 18A:7F–5(d). The statute also

---

[9] Recognizing that local factors will affect how much it will cost to deliver the content standards, CEIFA provides for a range, called the "T & E flexible amount." *N.J.S.A.* 18A:7F–12. For 1997–1998, the flexible amount is $336 (.05 × $6,720), and the T & E range is, therefore, $6,384 to $7,056.

[10] The May 1996 Plan also employed per-pupil weights similar to those utilized by the QEA: 0.5 for half-day kindergarten, 1.12 for middle school, and 1.2 for high school students. Those weights differ, however, from the per-pupil weights contained in the QEA, which were 1.1 for middle school and 1.3 for high school students.

[11] The "spending growth limitation" is defined as a percentage (three percent or the CPI, whichever is greater) of a district's prebudget year budget, taking

provides an avenue for increased local spending notwithstanding the spending growth limitation. *See N.J.S.A.* 18A:7F–5(d)(9) (providing for additional local spending pursuant to separate proposals submitted for approval at the annual school budget election).

The State contends that, for the first time, New Jersey has a comprehensive approach to the provision of a thorough and efficient education that correlates funding with substantive education. School funding determinations now will be based on how much it actually costs to provide students with an opportunity to meet defined achievement levels that equate with a thorough and efficient education. The State acknowledges that discretionary amounts can be spent in excess of the T & E amount, at least by the wealthier school districts. It contends, however, that such expenditures are inefficient and therefore unnecessary in achieving a thorough and efficient education, as defined by the statute's content standards. For that reason, according to the State, such excess spending by the wealthier districts is immaterial to the inquiry into whether students in the special needs districts are receiving a thorough and efficient education. In other words, the State asserts that CEIFA permits disparate per-pupil expenditures because those students who receive more educational resources are receiving superfluous and unneeded educational benefits, and those students who receive less educational resources nevertheless will receive that which is needed to provide a thorough and efficient education.

The State's argument in defense of the new approach thus frames the inquiry—CEIFA must stand or fall based on the validity of its premise that the T & E amount is sufficient to provide a thorough and efficient education for *all* students and that spending in excess of that amount in the wealthier districts is

---

into consideration changes in district enrollment, capital expenditures, transportation costs, and costs related to special education. *N.J.S.A.* 18A:7F–5(d). The effect of this method of calculation is that districts with larger pre-CEIFA budgets—generally, the wealthier districts—will receive a more generous spending growth limitation.

nothing more than expenditure that is inefficient and unnecessary for a thorough and efficient education.

## III

With the promulgation and adoption of substantive standards that define a thorough and efficient education, New Jersey joins a trend in favor of a standards-based approach to the improvement of public education. The movement for standards-based reform began in the late 1980s, and emerged as the principal strategy of educators in the early 1990s. *See* Lynn Olson, *Keeping Tabs on Quality, Education Week: Quality Counts,* Jan. 22, 1997, at 7–14.

■ Plaintiffs do not challenge the constitutionality or validity of the content standards. We fully acknowledge the substantial efforts of the coordinate branches to develop and to establish a comprehensive statutory and administrative system for public education founded on standards that define the substantive meaning of education and that provide for measures of educational performance and achievement. We conclude that the statutory standards are consistent with the Constitution's education clause.

In interpreting the constitutional meaning of a thorough and efficient education, the Court has consistently recognized that the Legislature is charged with the primary responsibility for public education. The Court has stressed repeatedly that "[t]he Legislature's role in education is fundamental and primary," and, "[t]he definition of the constitutional provision by this Court, therefore, must allow the fullest scope to the exercise of the Legislature's legitimate power." *Abbott* II, *supra,* 119 *N.J.* at 304, 575 *A.2d* 359.

■ At its core, a constitutionally adequate education has been defined as an education that will prepare public school children for a meaningful role in society, one that will enable them to compete effectively in the economy and to contribute and to participate as citizens and members of their communities. *See Abbott* I, *supra,* 100 *N.J.* at 280–81, 495 *A.2d* 376 (noting that the Constitution

requires "that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market" (citing *Robinson* I, *supra,* 62 *N.J.* at 515, 303 *A.*2d 273)); *Landis v. Ashworth,* 57 *N.J.L.* 509, 512, 31 *A.* 1017 (Sup.Ct.1895) (stating that a constitutionally adequate education must be "capable of affording to every child such instruction as is necessary to fit it for the ordinary duties of citizenship").

In *Abbott* II, the Court, was confronted with a clearly-demonstrated violation of the constitutional right to a thorough and efficient education for public school children in the poor urban districts, and was therefore impelled to find appropriate remedial relief. In the absence of legislative or administrative guidance, the Court looked to those districts that most likely were providing a level of education consistent with the Constitution. The Court concluded that, as a partial remedy for the constitutional deprivation, the State would have to assure a per-pupil expenditure for regular education in the SNDs that was substantially equivalent to the average per-pupil expenditure in the successful, DFG I & J districts. *Abbott* II, *supra,* 119 *N.J.* at 385, 575 *A.*2d 359. The Court's remedial order, though pragmatic in nature and necessarily incomplete and limited, was designed to further the achievement of an education that imparts those "critically important" skills needed to compete in the labor market, and that bestows the capacity to function as a citizen—as a contributing and participating member of society and one's community. *Id.* at 363, 575 *A.*2d 359.

■ The Court, without any valid legislative implementation of the constitutional education clause, has labored to devise appropriate remedies to ameliorate the deprivation of an adequate education in the special needs districts. *Cf. Robinson* I, *supra,* 62 *N.J.* at 519, 303 *A.*2d 273 (specifically noting that a determination of the adequacy of public education was complicated by the fact that "the State has never spelled out the content of the constitutionally mandated educational opportunity"). The Legislature has

now taken a major step to spell out and explain the meaning of a constitutional education. The content and performance standards prescribed by the new statute represent the first real effort on the part of the legislative and executive branches to define and to implement the educational opportunity required by the Constitution. It is an effort that strongly warrants judicial deference. *Cf. Hills Dev. Co. v. Bernards Twp.*, 103 *N.J.* 1, 510 *A.*2d 621 (1986) (upholding Fair Housing Act, *N.J.S.A.* 52:27D–301 to –328, as an adequate and valid legislative response to this Court's fair-housing decisions). We therefore conclude that the standards are facially adequate as a reasonable legislative definition of a constitutional thorough and efficient education.[12]

Our function, however, is to determine whether the new approach encompassing content and performance standards, together with funding measures, comports with the constitutional guarantee of a thorough and efficient education for all New Jersey school children. The standards themselves do not ensure any substantive level of achievement. Real improvement still depends on the sufficiency of educational resources, successful teaching, effective supervision, efficient administration, and a variety of other academic, environmental, and societal factors needed to assure a sound education. Content standards, therefore, cannot answer the fundamental inquiry of whether the new statute assures the level of resources needed to provide a thorough and efficient education to children in the special needs districts.

■ The funding provisions of the new statute purport to link educational inputs to the attainment of the content standards.

---

[12] At present, no organization in the United States evaluates state content standards on a substantive basis. The American Federation of Teachers (AFT) reviews state content standards to determine whether they are "clear and specific enough" to be of use to classroom teachers, but not to determine their rigor. On January 17, 1997, the AFT issued a report concluding that, on the whole, New Jersey's standards were not clear and specific enough to lead to a common core curriculum or to serve as a basis for funding determinations. The report did, however, praise some of the new standards, such as those relating to science, for clarity and substantive content.

Although a majority of states have moved toward a standards-based approach to public education,[13] New Jersey appears to be the first state to try to base funding determinations on achievement standards. The dual strategy adopted by the State must be measured against the standard of the thorough and efficient education clause. Because CEIFA does not in any concrete way attempt to link the content standards to the actual funding needed to deliver that content, we conclude that this strategy, as implemented by CEIFA, is clearly inadequate and thus unconstitutional as applied to the special needs districts.

The efficiency standards undergirding the statute's funding provisions are derived from a model district that has few, if any, characteristics of any of the State's successful districts. The State contends that it would be inappropriate to require funding determinations to be based on those districts because, despite their educational success, they have "notable inefficiencies" in their spending practices and, for that reason, the amount that they spend on education cannot serve as the measure of the amount necessary to achieve a constitutionally adequate education.

Neither CEIFA itself, the record in this case, empirical evidence, common experience, nor intuition supports the State's position that inefficiencies explain why successful districts' spending levels exceed what the State asserts is the amount needed to provide a thorough and efficient education.

The legislative history of CEIFA strongly undermines the argument that the wealthier districts' spending in excess of the T & E amount represents moneys dissipated in waste and inefficien-

---

[13] As of January 1, 1997, 31 states had adopted content standards in each of the core academic areas. Forty-seven states had adopted content standards in at least one core academic area, and nine of those states were in the process of developing standards for additional academic areas. *Standards and Assessments, Education Week: Quality Counts,* Jan. 22, 1997, at 32–35; *see also* 20 *U.S.C.A.* §§ 5801 to 6084 (Goals 2000: Educate America Act of 1994) (declaring eight national education goals, including demonstrated competency over subject matter in English, mathematics, science, foreign languages, civics and government, economics, art, history, and geography).

cy. As initially proposed, CEIFA would have required a separate public vote for any spending in excess of the maximum T & E amount; the proposed bill thus would have required higher-spending school districts to defend spending amounts that the Legislature had determined to be unnecessary. That proposal generated a strong reaction from educators and others in the wealthier districts, who clearly did not consider amounts spent in excess of the T & E amount to be educationally unnecessary; they labeled the proposal a "dumbing-down" approach to the school finance problem, and eventually it was abandoned. That rejection indirectly confirms the general perception and widespread belief that the level of spending for education in the wealthier districts is not attributable solely to inefficiency or directed to educational luxuries.

The statute further validates such "excess" spending. As enacted, CEIFA provides that a district may spend in excess of the maximum T & E amount, so long as the total budget does not exceed the prebudget year net budget by more than the spending growth limitation.[14] Furthermore, Section 5(d)(9) of the Act, not in the original bill, was added to permit spending in excess of the amount permitted by the spending growth limitation, so long as the voters specifically approve a local general fund levy for such purposes. *See also N.J.S.A.* 18A:7F–5(d)(10) (providing that the voters must be informed prior to the annual school budget hearing that the district has proposed "programs and services in addition to the core curriculum content standards adopted by the State Board of Education").

The fact that educators, interest groups, and the public convinced the Legislature to alter the proposed bill indicates that they were seeking something more than the right to waste money. Moreover, the fact that DFG I & J districts have continued to spend at levels above the T & E amount even though each year

---

[14] The statute provides several specific grounds for exemption from the spending growth limitation. *See N.J.S.A.* 18A:7F–5(d)(4), (5), (6), (7), & (8).

the budget must be approved by the local voters further confirms the common understanding that those expenditures secure genuine educational benefits. The fact that the State itself predicts that the wealthier districts will continue to spend in excess of the T & E amount undermines the claim that such spending reflects mere inefficiency.[15] *See Abbott* II, *supra*, 119 *N.J.* at 368, 575 *A.2d* 359 ("[I]f [expenditures] are not related to the quality of education, why are the richer districts willing to spend so much for them?").

There simply is no evidence to support the State's assertion that all amounts spent by Livingston, Princeton, Millburn, and the other successful districts in excess of the T & E amount constitute educational inefficiency. Inefficiency in public education has more to do with the way money is spent than the amount of money spent. Clearly the delivery of an adequate education requires efficiency in spending. The need to eliminate waste, to increase efficiency, and to maximize the education dollar—a need that is believed to be more acute in the special needs districts—does not lessen the need for resources. Both additional money and reformation of the way in which that money is spent are required to improve the conditions in failing school districts. *See, e.g.*, Ronald F. Ferguson, *Paying for Public Education: New Evidence on How and Why Money Matters*, 28 *Harv. J. on Legis.* 465 (1991) (concluding that both the amount of money spent and the way it is spent are important and correlate with achievement levels); *see* discussion *infra* at 192–195, 693 *A.2d* at 440–442. Undoubtedly there are inefficiencies in the spending practices of the wealthier and higher-spending districts, as there are in all districts.[16] It has

---

[15] The State calculates expected 1997–1998 per-pupil expenditures under CEIFA inclusive of both the weighted per-pupil amount and discretionary expenditures derived from locally raised revenue. Thus, the State anticipates that the DFG I & J districts will spend $8,431 on average per pupil in the 1997–1998 school year—far in excess of the weighted maximum T & E amount per pupil.

[16] For example, the State asserts that inefficiencies are the result of fractured school districts, *namely*, K–6, K–8, and 9–12 districts. The State further asserts

not been shown, however, that the undeniably enhanced level of education in the successful districts can be characterized as inefficient or redundant education.[17]

The model district also was not based on the characteristics of the special needs districts. Not one of the twenty-eight SNDs conforms with the model district, and CEIFA does not provide the funding necessary to enable those districts to achieve conformity. The model district thus assumes, as the basis for its resource allocations and cost projections, conditions that do not, and simply cannot, exist in these failing districts.

The fallacy in the use of a hypothetical model school district is that it can furnish only an aspirational standard. It rests on the unrealistic assumption that, in effectuating the imperative of a thorough and efficient education, all school districts can be treated alike and in isolation from the realities of their surrounding environment. For example, the model district assumes that one

that most of the DFG I & J districts are fractured, and thus laden with inefficiency. Indeed, fewer than 50% of the DFG I & J districts are K–12. Although it makes sense that small, splintered districts will not have the economies of scale to increase efficiencies in some budgetary areas, the State has neither identified those inefficiencies nor suggested how to remedy them. CEIFA does nothing to eliminate them. In any event, despite the dissent giving some credence to the contention, *post* at 212–213, 693 *A*.2d at 450–451, the State, cannot reasonably be understood to maintain that inefficiencies occasioned by fractured DFG I & J districts explain *all* spending in excess of the T & E amount.

[17] As measured by the HSPT, it is clear that the DFG I & J districts are successfully providing a thorough education. In the DFG I & J districts, pass rates on the October 1995 HSPT (all sections combined) range from 78.4% (Boonton) to 99.1% (Mountain Lakes), with 79% of the DFG I & J districts passing more than 90% of their students (96% of the DFG I & J districts passed more than 80% of their students). By that same measure, it is also clear that the SNDs are not providing a thorough education. In Trenton, for example, 26.8% of the students passed the October 1995 HSPT, and that figure actually may overestimate success because many students drop out of school in Trenton prior to reaching the 11th grade (in Trenton, the high school dropout rate in 1995–1996 was 11.20%). Although the pass rates vary greatly, all but one of the special needs districts passed fewer of their students than the state average (75.6%) on the October 1995 HSPT.

security guard is sufficient for a 900 pupil "model" high school. The model district therefore would provide funding for only 3.3 guards in the 3000 pupil Trenton High School. Presently, however, approximately twenty security guards are required to ensure the safety of high school students in Trenton. Surely the State would not contend that the seventeen additional security guards presently employed by Trenton High are unnecessary and mere constitutional excess. Although 3.3 security guards may be sufficient—or even excessive—in one of the wealthier suburban high schools, the State cannot base funding decisions on the assumption that the same is true in the inner city.

The same flaw inheres in other allocations of the model district. The model district assumes a uniform per-pupil amount for the construction and renovation of physical facilities: $133. Again, however, the model is insensitive to the conditions that actually exist in the special needs districts. It does not take into consideration the fact that the facilities in the SNDs are collectively much older and far more in need of repair than those in the other districts. *See* discussion *infra* at 186–188, 693 *A*.2d at 437–438. The same amount of money cannot possibly be sufficient in all districts without taking into consideration the age and present condition of the facilities. The same may be said of the operation and maintenance allocation, where the model district assumes the same amount per pupil in both the wealthy districts, with relatively newer facilities, and the SNDs, which contain most of the State's century-old buildings.

Finally, the model district assumes that all children are equally capable of taking advantage of educational opportunity, although the reality, of course, is that they are not. Because CEIFA clearly fails to provide the special and extra-educational programs and services required, *see* discussion *infra* at 177–186, 693 *A*.2d at 433–437, and because the model *assumes* that all students will be equally able to seize the educational opportunity, the inputs provided by the model cannot possibly assure an educational opportunity for the students in the SNDs comparable to that of the

students in the DFG I & J districts. The actuality is that under the new statute the wealthier districts will raise more locally and will spend more on relatively advantaged children than will the SNDs, which will spend less on disadvantaged children.

CEIFA prescribes that $6,720, the T & E amount for elementary school education, will be sufficient to enable the failing SNDs to make the needed improvements and adjustments to achieve a through and efficient education. The T & E amount of $6,720 per elementary school pupil differs from the QEA foundation amount by only eighty dollars per elementary school pupil. In *Abbott* III, we found the QEA amount to be unfounded, arbitrary, and patently insufficient to provide a thorough and efficient education to students in the special needs districts. Thus, it is difficult to fathom how eighty dollars could solve the constitutional problem. In fact, CEIFA's T & E amount applicable to a high school student is significantly less than the QEA's foundation amount applicable to those students. Under the QEA, a quality education in 1994–1995 purportedly could have been delivered to a high school student for $8,632; under CEIFA, a T & E education in 1997–1998 allegedly can be delivered for $8,400.[18]

We do not discount or minimize the State's contention that, as a legislative enactment, CEIFA is entitled to a presumption of validity. *In re C.V.S. Pharmacy Wayne,* 116 *N.J.* 490, 497, 561 *A.*2d 1160 (1989), *cert. denied,* 493 *U.S.* 1045, 110 *S.Ct.* 841, 107 *L.Ed.*2d 836 (1990). We likewise do not depart from the principle that deference is afforded to determinations that are the product of administrative expertise. *Mayflower Secs. Co. v. Bureau of Secs.,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973). We differ, however, from the dissent, which regards the presumption of validity as impenetrable because the statute's provisions allegedly rest on the opinions of experts. *Post* at 213–214, 693 *A.*2d at 450–451. The

---

[18] This results from the reduction in the per-pupil weights for high school students under CEIFA, *see supra* at 164 n. 10, 693 *A.*2d at 426 n. 10, implying that a efficient education for high school pupils can be anticipated to cost less under thorough and CEIFA in 1997–1998 than it did under the QEA for 1995–96.

factors we have recounted that bear on the adequacy of the statute's funding provisions thoroughly refute the State's fundamental contention that there is any basis for the conclusion that the T & E amount is adequate to provide the basic thorough and efficient education and that all spending in excess of the T & E amount in the wealthy and successful districts is educational waste; those considerations undermine any presumption in favor of the validity of the statute's funding measures.

The net effect of CEIFA's funding mechanism is to label both the DFG I & J districts and the SNDs inefficient. The successful DFG I & J districts allegedly are inefficient because they spend more than the T & E amount per pupil. The SNDs, compared to the optimally efficient hypothetical model school district, allegedly are inefficient because they will be unable to achieve a thorough and efficient education at the T & E amount. Further, CEIFA permits the DFG I & J districts to raise additional funds and to continue to spend inefficiently through local taxation. That outlet, however, is, in reality, closed to the SNDs. CEIFA effectively caps the poorer districts at an amount that by definition will be insufficient to provide a thorough and efficient education. On its own terms, therefore, CEIFA will be incapable of assuring a thorough and efficient education in the special needs districts. CEIFA will perpetuate a two-tiered school system in which the students in the wealthier districts will have the resources necessary either to meet or to exceed the standards, and in which the poorer urban districts will be asked to do the same or more with less. That system began to emerge on April 15, 1997, when a majority of suburban districts approved school budgets that dramatically exceeded CEIFA's T & E amount. *See* Robert Hanley, *New Jersey Voters Approve Extra Local School Spending, N.Y. Times,* Apr. 16, 1997, at B4 ("[V]oters in a sampling of districts in five suburban counties seemed generally willing to accept both the basic main budgets and [the] so-called second budgets authorizing

more spending than state guidelines provided."); Jeff May, *Towns Buck the Trends, The Star-Ledger*, Apr. 16, 1997 at A1, 7.[19]

The Court recognizes that CEIFA has provided a new, facially valid definition of the substantive educational opportunity required by the Constitution. We endorse the legislative judgment that the act's detailed standards embody the substantive content of a thorough and efficient education. We are, however, still without any constitutional measuring stick against which to gauge the resources needed to provide that educational opportunity other than the inputs in the DFG I & J districts. We reject the State's invitation to turn a blind-eye to the most successful districts in the State. We are unimpressed by the dissent's implicit suggestion that the so-called "middle districts," which will spend, on average, $7,144 per pupil in the current school year, can serve as a more appropriate measure of relief. *See post* at 211, 693 *A.2d* at 450. Without any information or experience regarding achievement levels in those districts—either in terms of the content standards or any other standard—it is difficult to infer that those districts represent the most appropriate barometer of a basic thorough and efficient education. The DFG I & J districts are achieving and undoubtedly will continue to achieve at high levels, and it is thus eminently reasonable that the Court continue to focus on their recipe for success until experience under the new standards dictates otherwise.[20]

---

[19] For example, in Morris County, 16 of 18 proposed second budgets were approved. In neighboring Somerset County, voters accepted Bernards Township's supplemental $2.9 million plan, one of the State's highest, extra spending of $686,000 in Bound Brook, $2.1 million in Montgomery Township, and $952,700 in Somerville. In Essex County, extra spending of $1.7 million in Livingston and $1.8 million in Bloomfield also passed. Livingston's business administrator stated that spending in excess of the T & E amount demonstrates that, "[i]n Livingston, voters have shown that kids come first." Hanley, *supra*, at B4.

[20] We recognize that CEIFA contains provisions that periodically would update the core curriculum content standards and the efficiency standards based on an examination of the practices in the successful districts. *See N.J.S.A.* 18A:7F–4. Those mechanisms, however, do not overcome the inadequacy of the model

We conclude that CEIFA's funding provisions for regular education expenditures are unconstitutional as applied to the special needs districts.

## IV

The new statute, like its predecessor, also purports to address the unique and profound disadvantages facing students in the special needs districts. Based on the substantial record developed by the Office of Administrative Law, we found in *Abbott* II that "something more" was needed to help those disadvantaged children achieve at levels comparable to their more advantaged peers. Like its predecessor, however, CEIFA is incapable of providing the remediation that will overcome that constitutional deprivation.

## A.

Throughout much of the nation, the worst educational conditions exist in poor, inner-city schools. The children in those urban schools achieve lower levels of academic performance than children in other areas. That national phenomenon is evident in our State.[21] The poor educational achievement levels evident in inner-city schools results in part from the absence of needed educational programs, the lack of qualified teachers, and the existence of decrepit, dangerous, and overcrowded facilities. *See generally* Johnathan Kozol, *Savage Inequalities: Children in America's*

---

district presently governing the amount of money that must be spent on regular education.

[21] Although 75.6% of students state-wide passed the overall October 1995 HSPT, students in the poor urban areas did not fare nearly as well. For example, the passing rate for Camden City was 44.4%; Asbury Park, 42.5%, Bridgeton City, 47.7%, East Orange City, 30.2%; Elizabeth City, 32.6%; Gloucester City, 66.4%; Hoboken City, 51.2%; Passaic City, 39.4%; Irvington Township 19.9%; Orange City, 28.8%; and Union City, 40.4%. In *Abbott* II, *supra*, we noted that "[t]he failure rate of these poorer urban districts on even this minimal test, the depth of that failure, testifies eloquently not just about their inadequate performance, but about their need." 119 *N.J.* at 369, 575 *A.2d* 359.

*Schools* (1991) (describing severe inequalities and inadequacies of poor inner city students' education).

Unfortunately, obstacles to a thorough and efficient education are present not only in the schools themselves, but also in the neighborhoods and family conditions of poor urban children. With concentrated poverty in the inner-city comes drug abuse, crime, hunger, poor health, illness, and unstable family situations. Violence also creates a significant barrier to quality education in city schools where often just getting children safely to school is considered an accomplishment. Those conditions further contribute to grave discipline problems and high dropout rates.[22]

The special needs districts are also racially isolated.[23] *See Abbott* II, *supra,* 119 *N.J.* at 392, 575 *A.*2d 359 ("The devastation of the urban poor is more significant in New Jersey than in most states because of our demographics and the structure of our society. Our large black and hispanic population is more concentrated in urban areas and will remain isolated from the rest of society unless this educational deficiency in poor urban areas is addressed."). In fact, New Jersey has the fourth most racially segregated school system in the nation. *See* Gary Orfield, et al., *Deepening Segregation in American Public Schools,* at 27–28, 35 (Apr.1997) (finding that, in New Jersey, 53.7% of black children attend schools with minority populations greater than 90%, whereas only 26.6% of black children attend majority white schools; 43.4% of Latino children attend schools with minority populations greater than 90%, whereas only 27.3% of Latino children attend majority white schools).

---

[22] In 1995–96, dropout rates in urban high schools were as a high as 31.2% (Henry Snyder High in Jersey City). The dropout rate was 24.7% at Lincoln High in Jersey City, and 20.2% at Eastside High in Paterson. In 1995–1996, dropout rates in the DFG I & J districts ranged from zero percent (several) to a high of 2.9% (Cherry Hill West High). *See also Abbott* II, *supra,* 119 *N.J.* at 370, 575 *A.*2d 359 (citing dropout rates for some urban high schools as high as 47%).

[23] In 1994–1995, the SNDs were, in the aggregate, 47% black, 33.5% Latino, and 15.4% white.

The extreme disadvantages facing children in the SNDs were documented by the findings of the ALJ and became the basis for our decisions in *Abbott* II and III. Those findings revealed that

[m]any poor children start school with an approximately two-year disadvantage compared to many suburban youngsters. This two-year disadvantage often increases when urban students move through the educational system without receiving special attention.... They are often from single parent households, headed by a mother who is poorly educated. They are exposed to more stress, from street crime, overcrowding and financial problems.... Nutrition and health care are also likely to be deficient.

[ALJ Decision, *supra,* at 28.]

Based on that record, we determined that the needs of students in the SNDs were much greater than those of students in the DFG I & J districts. "Those needs go beyond educational needs, they include food, clothing and shelter, and extend to lack of close family and community ties and support, and lack of helpful role models. They include the needs that arise from a life led in an environment of violence, poverty and despair." *Abbott* II, *supra,* 119 *N.J.* at 369, 575 *A.2d* 359.

Those special needs clearly must be confronted and overcome in order to achieve a constitutionally thorough and efficient education. In *Abbott* II, we mandated the provision of supplemental aid to the SNDs as part of the constitutional remedy. *Id.* at 386, 575 *A.2d* 359. We stated:

In *Robinson* I we observed that the State may recognize ... a need for additional dollar input to equip classes of disadvantaged [students] for the educational opportunity. This reference to students' special needs was given added content in *Abbott* I where we observed that in some cases for disadvantaged students to receive a thorough and efficient education, the students will require above-average access to education resources and that this bears on the amount of money that a school district must be able to provide for its children.

. . . .

It is clear to us that in order to achieve the constitutional standard for the student from the poorer urban districts ... the totality of the districts' educational offering must contain elements over and above those found in the affluent suburban districts....

[*Id.* at 373–74, 575 *A.2d* 359 (citation and quotations omitted).]

In *Abbott* III, *supra*, we reemphasized that component of the constitutional remedy:

> [S]tudents in the special needs districts have distinct and specific requirements for supplemental educational and educationally-related programs and services that are unique to those students, not required in wealthier districts, and that represent an educational cost not included within amounts expended for regular education.... The money mandated by *Abbott* [II] cannot bridge the gap without significant intervention in the form of special programs and services targeted to the needs of these disadvantaged students.
>
> [136 *N.J.* at 453–54, 643 *A.*2d 575.]

Accordingly, we again directed the State to confront the needs of disadvantaged children:

> The primary concern, the goal of the Department, the Legislature and indeed the public, is the actual achievement of educational success in the special needs districts. The record before us makes it clear that success cannot be expected to be realized unless the Department and the Commissioner identify and implement the special supplemental programs and services that the children in these districts require. Without them, they will not have a fair chance to achieve that success.
>
> [*Id.* at 454, 477 *A.*2d 1278.]

Thus, our jurisprudence has recognized consistently that the exceptional needs of the SNDs must be addressed if the constitutional deprivation is to be remediated.

### B.

CEIFA deals with the special needs of disadvantaged students through two initiatives: Demonstrably Effective Program Aid (DEPA), *N.J.S.A.* 18A:7F–18, and Early Childhood Program Aid (ECPA), *N.J.S.A.* 18A:7F–16. The amount of aid provided for those programs, however, is not based on any actual study of the needs of the students in the SNDs or the costs of supplying the necessary programs.

DEPA may be compared to the at-risk aid program of the QEA. It is geared specifically toward programs for children from low-income families. DEPA is intended to fund "instructional, school governance, and health and social service programs" to benefit students enrolled in schools in which the concentration of low-income pupils is greater than twenty percent of total enrollment. *N.J.S.A.* 18A:7F–18(a).

For 1997–1998, the predetermined amount of DEPA is $300 per pupil in districts where the low-income pupil concentration is between twenty and forty percent, and $425 per pupil in districts with greater than forty percent low-income pupil concentration; the per-pupil amounts will be increased by the CPI for 1998–1999, and will be established on a biennial basis in subsequent years. *Ibid.* CEIFA does not disclose the basis for those amounts. It does provide, however, that "[f]or subsequent years, the amounts shall ... be derived from cost analyses of appropriate programmatic applications as identified in the report." *Ibid.*

CEIFA provides a list of programs that qualify for DEPA for 1997–1998: "alternative schools; community schools; class size reduction programs; parent education programs; job training programs; training institutes to improve homework response; telephone tutorial programs; teleconference and video tutoring programs; and HSPT/Early Warning test before school/after school preparation programs." *N.J.S.A.* 18A:7F–18(b)(1).

CEIFA requires districts to maintain separate DEPA program and service accounts and financial records. *N.J.S.A.* 18A:7F–18(b)(3). It also requires districts to obtain the approval of the DOE for the planned uses of the funds. *N.J.S.A.* 18A:7F–18(b)(2). Any district failing to use the funds in the prescribed manner is subject to the rescission of aid and additional monetary penalties. *Ibid.*

■ Although the statute lists various programs that qualify for DEPA, *N.J.S.A.* 18A:7F–18(b)(1), none of the programs listed are required to be implemented and there is no evidence that the aid provided will be sufficient to cover the costs of such programs. Neither CEIFA nor the May 1996 Plan explains or analyzes how the DEPA amounts were determined by the State. It is clear that in establishing the prescribed amounts, neither the Legislature nor the Commissioner made any study of the programs and services needed by children in the SNDs. Those are the very deficiencies that led the Court to invalidate the QEA's at-risk aid provisions in *Abbott* III, *supra,* 136 *N.J.* at 452–54, 643 *A.2d* 575.

The list of eligible programs, a so-called menu approach, cannot serve as a substitute for a detailed study as the basis for identifying the actual needs of the SNDs and determining the costs associated with implementing required programs. *See id.* at 454, 643 *A.*2d 575. The State, argues that the DEPA approach provides districts with the flexibility to select the programs that are most able to meet their distinctive needs. The State, however, cannot shirk its constitutional obligation under the guise of local autonomy. "Flexibility" does not ensure that the most needed programs will be included in the menu, or that the money provided by DEPA will be sufficient to implement the needed programs.

Also purporting to address the needs of at-risk students is ECPA. *N.J.S.A.* 18A:7F–16. That aid is intended to provide for full-day kindergarten and preschool classes and other childhood programs and services. *Ibid.* In the academic year 1997–1998, districts with a low-income pupil concentration between twenty and forty percent will receive $465 multiplied by district enrollment, and districts with a low-income pupil concentration in excess of forty percent will receive $750 multiplied by district enrollment. *Ibid.* Once again, the statute does not disclose the basis for those numbers.[24]

In order to receive ECPA, a district is required to submit an "operational plan" that must establish qualifying programs by the 2001–2002 school year. Despite the fact that districts need not have operational qualifying programs until 2001–2002, districts are permitted to receive ECPA beginning in 1997–1998 and to use it for

> educationally meritorious programs or for the purpose of constructing new school facilities or enlarging existing school facilities for use by pupils other than those

---

[24] The dollar figures are to be adjusted by the CPI for the 1998–1999 school year, and in subsequent years shall be determined biennially "derived from cost analyses of appropriate programmatic applications of these funds...." *N.J.S.A.* 18A:7F–16.

enrolled in early childhood programs, provided the new or enlarged facilities are used for and are adequate to house the planned early childhood programs. *[Ibid.]*

Districts that maintain progress consistent with the implementation plan may also use ECPA for demonstrably effective programs prior to establishing the early childhood programs. *Ibid.*

The implementation of preschool and full-day kindergarten are the only supplemental programs specifically identified in CEIFA that are (eventually) required to be implemented. We have identified early childhood education as an essential educational program for children in the SNDs. *See, e.g., Abbott* II, *supra,* 119 *N.J.* at 373, 575 *A.*2d 359 ("[I]ntensive pre-school and all-day kindergarten enrichment program[s are necessary] to reverse the educational disadvantage these children start out with."); *see also* Carnegie Corporation of New York, *Years of Promise: A Comprehensive Learning Strategy for America's Children,* Sept. 1996, at vii (concluding from study conducted by education experts that for most children the long-term success of their learning and development depends to a great extent on what happens to them between the ages of three and ten).[25] The provision of full-day kindergarten and preschool is an indispensable component of any educational program designed to aid children in the SNDs.

CEIFA requires districts to submit to the Commissioner an operational plan to establish preschool and full-day kindergarten for all four and five year-olds by the 2001–2002 school year. *N.J.S.A.* 18A:7F–16. That delay is a glaring weakness. Delaying implementation until 2001 means that four more classes of disadvantaged children will miss out on programs virtually essential to

---

[25] In February 1990, the National Governors' Association adopted a set of "National Education Goals." Under Goal 1, readiness for school, the governors suggested that "[a]ll eligible children should have access to ... a successful preschool program with strong parental involvement and that "[o]ur first priority must be to provide at least one year of preschool for all disadvantaged children." *Abbott* II, *supra,* 119 *N.J.* at 373 n. 37, 575 *A.*2d 359 (citing National Governors' Association, *National Education Goals,* 7 (1990)).

future educational success.[26]

CEIFA provides no basis for the ECPA per-pupil amounts. We therefore are unable on this record to determine that ECPA is sufficient to enable the SNDs to provide the required early childhood programs. As with DEPA, it appears that no study was undertaken to determine the actual costs of implementing the necessary programs.

Our conclusion that ECPA is inadequate finds support in the fact that one of the most significant problems facing the SNDs is a lack of adequate classroom space for early-childhood programs. CEIFA partially attempts to address that concern by permitting the use of ECPA for facilities construction if such construction supports the future provision of early-childhood programs. *N.J.S.A.* 18A:7F–16. In the absence of a detailed study, however, it is impossible to determine whether such aid is sufficient to enable the SNDs to repair and/or to expand existing facilities to house preschool and full-day kindergarten programs for all children by 2001. In light of the fact that CEIFA fails to provide sufficiently for facilities construction outside of ECPA, it is unlikely that schools will have the facilities needed to house the early-childhood programs.

---

[26] A proposed regulation authorizing the Commissioner to pressure districts to implement early-childhood programs before 2001 does not sufficiently mitigate that unnecessary and unjustifiable delay. *See N.J.A.C.* 6:19 (proposed). The proposed regulation provides that if a district board "does not intend to fully serve all four and five year-olds in the 1997–98 school year," it shall submit to the Commissioner an annual assessment until full implementation has occurred. *N.J.A.C.* 6:19–3.2(c) (proposed). The regulation continues:

If the assessment indicates that the district has the ability to fully implement or expedite the implementation of such programs, the district board of education shall also submit a detailed explanation as to the reasons why it chooses to implement such programs over a longer period of time and/or why the use of a capital reserve account is necessary. The Commissioner may direct the full implementation or expedited implementation of such programs as he or she deems appropriate and/or reduce or deny deposits to a capital reserve account if he or she determines that further delay in implementation is not warranted.

[*Ibid.*]

Furthermore, until 2001, CEIFA permits districts to use ECPA for non-early childhood expenses, including so-called "educationally meritorious programs." *N.J.S.A.* 18A:7F–16. That provision would permit districts to use early childhood program dollars on programs that supplement their regular education budgets. As such, that provision would dilute the ability of the SNDs eventually to provide early-childhood education for all eligible students.[27]

 The State contends that experts were involved in formulating the amounts of DEPA and ECPA and that the Court should defer to their determinations. Children in the special needs districts have been waiting more than two decades for a constitutionally sufficient educational opportunity. We are unwilling, therefore, to accede to putative expert opinion that does not disclose the reasons or bases for its conclusions. We have ordered the State to study the special educational needs of students in the SNDs. That has not been done. We also have ordered the State to determine the costs associated with implementing the needed programs. Those studies have not occurred. Without studies of actual needs, it is unclear how a sound program providing for those needs has been accomplished.

The State has failed to demonstrate a basis for the per-pupil amounts for supplemental programs, and we thus cannot accept the proposition that the DEPA and ECPA per-pupil amounts will

---

[27] The Commissioner concedes that that diluting effect was one of the primary weaknesses of the QEA's at-risk aid program. *See Comprehensive Plan for Educational Improvement and Financing* 13 (Nov.1995). Under the QEA, at-risk aid was not earmarked for particular programs. *Ibid.* Therefore, many districts used portions of their at-risk aid in ways that were "unrelated to its intended purpose (*e.g.,* to expand the regular education budget, to increase salaries of existing staff, to hire consultants or staff with nondescript titles, or to pay for transportation.)." *Ibid.* It appears that under the "educationally meritorious" exception, districts could similarly misuse ECPA for non-early-childhood programs. Indeed, we were informed at oral argument that some financially-strapped poorer urban districts were planning to use the CEIFA exception in that fashion.

enable the SNDs to implement preschool, full-day kindergarten, and other constitutionally required programs.

## C.

 CEIFA completely fails to address one of the most significant problems facing the SNDs—dilapidated, unsafe, and overcrowded facilities. The statute neglects to consider the dire need for facilities improvement.[28] Amicus points out that that omission contributes to the inadequacy of the statute as a remedial measure and renders it unconstitutional. Contrary to the argument of the State, the condition of school facilities always has been of constitutional import. Deteriorating physical facilities relate to the State's educational obligation, and we continually have noted that adequate physical facilities are an essential component of that constitutional mandate. *See Abbott* II, *supra,* 119 *N.J.* at 362, 575 *A.*2d 359 ("A thorough and efficient education also requires adequate physical facilities."); *Robinson* I, *supra,* 62 *N.J.* at 520, 303 *A.*2d 273 ("We have discussed the existing scene in terms of current operating expenses. The State's obligation includes as well the capital expenditures without which the required educational opportunity could not be provided."); *see also N.J.S.A.* 18A:7A–5(f) (repealed) (stating that one part of a thorough and efficient education requires "[a]dequately equipped, sanitary and secure facilities").

Many school buildings in the special needs districts are in dramatic disrepair. *Abbott* II, *supra,* 119 *N.J.* at 362, 575 *A.*2d 359. That circumstance was included in the findings of the ALJ, whose record became the evidentiary basis for our decisions in *Abbott* II and III and remains germane to our decision today. *See*

---

28 CEIFA does not acknowledge facilities concerns for 1997–1998. *N.J.S.A.* 18A:7F–27. In subsequent years, State aid for facilities will be determined "through a formula which reimburses districts for all or part of the principal and interest payments on both debt service and lease purchase payments." *N.J.S.A.* 18A:7F–26. Without any elaboration, the statute provides that only "approved costs" will be reimbursed. *Ibid.*

ALJ Decision, *supra*, at 15–41, 480–99 (discussing the conditions of plaintiffs' schools). The accounts of crumbling and obsolescent schools inundate the record. Forty-nine public-school buildings in the State are one-hundred years of age or older. Seventy-three percent of those century-old buildings are located in SNDs. Furthermore, forty-one percent of the total number of school buildings statewide are over fifty years old. In the SNDs, sixty-four percent of the buildings are over fifty years old.

Most schools in the special needs districts lack library/media centers, are physically incapable of handling new technology, are deficient in physical facilities for science, and cannot provide sufficient space or appropriate settings for arts programs. Most schools also lack adequate physical-education space and equipment. There is simply no space in these districts to reduce class size; no place for alternative programs; no room to conduct reduced or eliminated programs in music and art; and no space for laboratories. The State's new core curriculum standards will only increase the need for capital expenditures to improve and to augment physical facilities. And, as noted, many SNDs will continue to be incapable of providing early childhood programs because of a lack of space to house the additional student enrollment.

In 1994, the Governor's Education Funding Review Commission (the Commission) found that "[f]acilities improvement is a critical issue which must be addressed if educational improvement is to be achieved within the special needs districts." [29] *Education Funding Review Commission, Financing New Jersey's Public Schools* 16 (July 1994). The Commission recommended that the DOE

---

[29] The problem of deteriorating school facilities is not unique to New Jersey. In his 1997 State of the Union Address, President Clinton stated that

we cannot expect our children to raise themselves up in schools that are literally falling down. With student population at an all time high, and record numbers of school buildings falling into disrepair, this has now become a serious national concern.

[President William J. Clinton, State of the Union Address (Feb.1997).]

conduct a study to determine the most appropriate financing method to "address the unmet physical facilities needs of school districts." [30] *Ibid.* It does not appear that any such study has been conducted, and CEIFA fails to address the estimated "$6 billion facilities needs for New Jersey's public schools." *Ibid.* Such a failure is of constitutional significance—we cannot expect disadvantaged children to achieve when they are relegated to buildings that are unsafe and often incapable of housing the very programs needed to educate them.

The State must, as part of its obligation under the education clause, provide facilities for children in the special needs districts that will be sufficient to enable those students to achieve the substantive standards that now define a thorough and efficient education. The quality of the facilities cannot depend on the district's willingness or ability to raise taxes or to incur debt.

### D.

We conclude that CEIFA's provisions for supplemental aid applicable to the special needs districts are unconstitutional.

### V

CEIFA is incapable of providing a substantive educational opportunity to public school children in the poorer urban districts that will enable them to achieve a thorough and efficient education. It is, consequently, unconstitutional in relation to the special needs districts. This continued deprivation of the constitutional right to a thorough and efficient education necessitates a remedy.

---

[30] The Commission also noted that the "problem of substandard physical facilities becomes that much more acute in light of the fact that following a period of enrollment decline, it is now estimated that between the 1992–1993 school year and the 2000–2001 school year, New Jersey's school population will increase by approximately 226,000 students placing increasing demands on school buildings." *Education Funding Review Commission, supra,* at 16.

We consistently have recognized that no single remedy can assure the provision of a constitutionally thorough and efficient education to the children in the special needs districts. *See, e.g., Abbott* III, *supra,* 136 *N.J.* at 455–46, 643 *A.*2d 575 ("We realize our remedy may fail to achieve the constitutional object, that no amount of money may be able to erase the impact of the socioeconomic factors that define and cause these pupils' disadvantages. We realize that perhaps nothing short of substantial social and economic change affecting housing, employment, child care, taxation, [and] welfare will make the difference for these students...." (citing *Abbott* II, *supra,* 119 *N.J.* at 374–75, 575 *A.*2d 359)).

The judicial remedy is necessarily incomplete; at best it serves only as a practical and incremental measure that can ameliorate but not solve such an enormous problem. It cannot substitute for the comprehensive remedy that can be effectuated only through legislative and executive efforts.

The finiteness of judicial power, however, does not diminish the judicial obligation to vindicate constitutional rights. Plaintiffs seek affirmation of their constitutional right to an opportunity that will enable them to achieve a thorough and efficient education, that is, a level of education that will allow them to assume a place in society as competitive and effective workers and contributors— an educational opportunity that is now to be defined and measured by the content standards of the new act. Accordingly, the interim remedy that we mandate to effectuate that right is the improvement of regular education through increased funding. The increased funding shall assure parity in per-pupil expenditures between each SND and the budgeted (as opposed to predicted) average expenditures of the DFG I & J districts by the commencement of the 1997–1998 school year. That remedy for regular education in the SNDs also shall include the implementation of administrative measures that will assure that all regular education expenditures are correctly and efficiently used and applied to maximize educational benefits. Further, we continue to insist that

the State address special education needs by determining and implementing those supplemental programs essential to relieve students in the special needs districts of their unique disadvantages.

## A.

The remedy of increased funding at the level of parity in per-pupil expenditures for regular education is one of practicality and necessity; it is an incremental measure that can contribute to the improvement of education. *See Abbott* II, *supra,* 119 *N.J.* at 303–15, 575 *A.*2d 359 (discussing evolution of New Jersey school-funding jurisprudence from focus on parity in per-pupil expenditures to focus on substantive educational opportunity, and noting that funding and spending are relevant only if money impacts quality of educational opportunity); *see also* Martha L. Minow, *School Finance: Does Money Matter?,* 28 *Harv. J. on Legis.* 395 (1991) (stressing that parity remedy also is supported by considerations of basic fairness). We emphasize that plaintiffs' right is one of thorough and efficient educational opportunity; parity is simply one judicial remedy that can help to create that opportunity. *See* William E. Thro, *Judicial Analysis During the Third Wave of School Finance Litigation: The Massachusetts Decision as a Model,* 35 *B.C. L.Rev.* 597 (1994) (discussing difference between "equality suit," focused on per-pupil expenditures, and "quality suit," focused on substantive educational opportunity). Increased funding at parity is our chosen interim remedy because it is beyond dispute that per-pupil expenditures remain a relevant and important element in the attempt to assure constitutionally sufficient educational opportunity.

The State's additional argument that increased funding at any level no longer should be required overstates the significance of the closing gap in per-pupil spending statewide. When *Abbott* II was decided, the SNDs were spending between seventy and seventy-five percent of the DFG I & J average per pupil; by the time *Abbott* III was decided, the SNDs were spending approxi-

mately eighty-four percent of the DFG I & J average per pupil. The State informs us that the SNDs are spending eighty-nine percent of the DFG I & J average in the current school year. However, CEIFA effectively arrests any movement toward funding equality.[31]

The Court, in ordering this interim funding relief, understands, as does the dissent, *post* at 215–216, 693 *A.*2d at 452, that money alone cannot solve the problems afflicting the SNDs. *See Abbott III, supra,* 136 *N.J.* at 455, 643 *A.*2d 575 ("As we noted in *Abbott* [II], equality of money does not assure quality of education. Nor does the grant of additional funds assure that they will be well spent."). Nevertheless, the State does not and cannot argue that money is irrelevant to the provision of a thorough and efficient education. Rather, the argument is that CEIFA's new approach to funding—ostensibly tied to achievement of the content standards—obviates the need for any funding over the T & E amount, let alone, spending parity. The State, however, has neither validated the T & E amount nor established that spending in excess of the T & E amount is mere inefficiency. *See* discussion, *supra* at 169–174, 693 *A.*2d at 429–431. The Court, therefore, resorts to an objective and reasonable indicator of the resources necessary

---

[31] The State argues that the disparity will be further reduced under CEIFA in the 1997–1998 school year. Treating ECPA as supplemental program aid, the State predicts that the SNDs' average per-pupil regular education expenditure will be 91% of the DFG I & J average in 1997–1998. The State's statistics are based on questionable assumptions. For example, it may be inappropriate to assume that the poorer urban districts will spend 3.4% in excess of the T & E amount because under CEIFA, all funding in excess of the T & E amount is derived exclusively from local taxation. Although the State asserts that this 3.4% spending in excess of the T & E amount assumes no tax increase in the SNDs, the fact that, according to the DOE, most education funding in most of these districts comes from State funding undermines this assumption.

Furthermore, the State's projection that the SNDs will, on average, spend 91% of the average of the DFG I & J districts per-pupil may be inflated by the inclusion within the SND average of those districts spending at parity. Although possibly appropriate from a statistical standpoint, it cannot mask the fact that in some districts spending will be below the average. Moreover, the inclusion of ECPA in the parity calculations may be inappropriate. *See* discussion *infra* 197 n. 36, 693 *A.*2d at 443.

for the provision of a thorough and efficient education, namely, those successful districts that, consistent with the Constitution, most likely will achieve at the levels established by the standards under the statute.

Our recourse to monetary relief is indirectly supported by the State's own spending practices in the school districts that it now operates. Although the State argues that the T & E amount under CEIFA is sufficient to provide a thorough and efficient education, the Commissioner has been spending in excess of that amount in all of the State-operated districts, and in the vicinity of the DFG I & J average in at least two of the three districts. The State took over the Jersey City school district in October 1989, and the district spent $8,135 per pupil in the 1995–1996 school year. That was close to the 1995–1996 DFG I & J average per-pupil expenditure ($8,223). In Paterson, operated by the State since August 1991, the district spent $7,800 per pupil in 1995–1996. In Newark, a State-operated school district since July 1995, the district has increased per-pupil expenditures annually. In the 1994–1995 school year, Newark spent $8,829 per pupil; in 1995–1996, the district spent $9,591 per pupil; the State plans to spend $9,700 per pupil in the present school year.

Increased funding for regular education alone cannot be considered sufficient, even as an interim form of relief. Experience has demonstrated that additional money will not, without more, solve the chronic problems of educating students in the SNDs. Equally important, if not more so, is the manner in which the money is spent. *See Abbott* II, *supra,* 119 *N.J.* at 388, 575 *A.*2d 359 ("We find the evidence of the importance of competent management to the quality of education substantial."); *see also Resources, Education Week: Quality Counts,* Jan. 22, 1997, at 54–55 (providing an overview of contemporary school-finance literature, and concluding that both the amount of money and the way it is spent have an impact on the quality of education); Ferguson, *supra,* 28 *Harv. J. on Legis.* at 465 (finding a correlation between the manner in which educational funding is spent and student achieve-

ment levels); Richard J. Murnane, *Interpreting the Evidence on "Does Money Matter?"*, 28 *Harv. J. on Legis.* 457 (1991) (finding that money, if spent prudently on such things as teachers and class-size reduction, has a substantial effect on education); Richard J. Murnane & Frank Levy, *Teaching the New Basic Skills: Principles for Educating Children to Thrive in a Changing Economy* 207 (1996) ("More money, then, is no guarantee that students will learn the New Basic Skills. In the language of logicians, more money may be *necessary* for improvement but it is never *sufficient* for improvement."); Harold Wenglinsky, Educational Testing Service, *When Money Matters: How Educational Expenditures Improve Student Performance and How They Don't* (1997) (concluding that increased expenditures on teacher-student ratios, for example, have a demonstrable positive impact on student performance at some educational levels).

Educational funding must be accompanied by firm controls. As we have stated previously,

[i]n respect of the action to be taken by the State, we note our specific concerns about the need for supervision of the use of additional funding for the special needs districts . . .

. . . .

Although the QEA required each special needs district to establish an educational improvement plan, to be approved by the Commissioner, and directed the Commissioner to verify that each district's budget had adequate resources to implement the plan, *no evidence in the record suggests any correlation between the additional funding received by the special needs districts and the implementation of their respective educational improvement plans.*

[*Abbott* III, *supra,* 136 *N.J.* at 451–52, 643 *A.*2d 575 (citation omitted and emphasis added).]

Thus, we have always insisted that increased funding to the SNDs be allocated for specific purposes realistically designed to improve education. The Commissioner has an essential and affirmative role to assure that all education funding is spent effectively and efficiently, especially in the special needs districts, in order to achieve a constitutional education.

██ CEIFA itself recognizes that constitutional obligation. It affords substantial authority to the Commissioner over the way money is spent in the special needs districts. The Commissioner may order increased expenditures, make budgetary reallocations and programmatic adjustments, and take summary actions when either a district or a particular school is failing to achieve the content standards. *See N.J.S.A.* 18A:7F–6(a), (b). Specifically, in respect of the special needs districts, the Commissioner is required to review the proposed budget and to assess efforts to "direct funds into the classroom." *N.J.S.A.* 18A:7F–6(c).[32] Under a proposed regulation, the Commissioner "shall conduct an assessment of efforts in each Abbott district" to increase program offerings and to reduce class sizes. *N.J.A.C.* 6:19–2.2(b) (proposed). The proposed regulation directs the Commissioner to modify or to augment the SNDs' budgets to achieve "appropriate class sizes and other efficiency standards." *N.J.A.C.* 6:19–2.2(c) (proposed).

The dissent unfairly characterizes the Court's remedy as, essentially, "throwing" money at the SNDs untied to particular programmatic applications and without firm accountability. *Post* at 169, 693 *A.*2d at 429. On the contrary, we require that the Commissioner use his statutory and regulatory authority to ensure that the increased funding that we have ordered today be put to optimal educational use. The Commissioner shall apply the additional funding to the improvement of the students' ability to achieve the content standards in the special needs districts. That injunction is both necessary and appropriate to assure the efficacy of monetary relief. *Cf. Wenglinsky, supra,* at 8 (noting with approval the general approach of the Kentucky Supreme Court in

---

[32] We note that CEIFA authorizes the Commissioner to direct additional expenditures in the special needs districts, when he deems it necessary to ensure implementation of the content standards, "up to the maximum T & E budget without approval of the local voters or board of school estimate, as applicable." *N.J.S.A.* 18A:7F–6(c). That limitation, however, need not be observed as to the special needs districts in light of our determination that its application to those districts is unconstitutional.

*Rose v. Council For Better Education, Inc.*, 790 *S.W.*2d 186 (1989), that recognized that the state "should earmark dollars for specific activities the court deemed important for raising student achievement, such as instructional materials and professional development programs for teachers"). The Commissioner may, within his sound discretion, direct the use of the money to hire additional teachers, to reduce class sizes, to increase program offerings, *see* *N.J.A.C.* 6:19–2.2(b) (proposed), to provide needed school supplies, or to implement additional programs focused on achievement of the content standards. In sum, the State must take affirmative and aggressive action to ensure that all regular education funding, including the additional remedial money, is spent effectively and efficiently in the special needs districts.

CEIFA assumes that all New Jersey students have the ability to meet the substantive standards, but it effectively requires the disadvantaged children in the SNDs to achieve the same standards with fewer educational resources. That requirement is unfair because the disadvantaged children in the SNDs are not accorded the same means for seizing the educational opportunity as their suburban peers. It is clear that their capacity to achieve a basic education is anchored by myriad and devastating familial, social, and environmental problems, and this makes the CEIFA approach doubly unfair. If all students are expected to achieve the same goals, educational resources should place them all at the same starting line. *See Abbott* II, *supra,* 119 *N.J.* at 375, 575 *A.*2d 359 ("If the claim is that additional funding will not enable the poorer urban districts to satisfy the thorough and efficient education test, the constitutional answer is that they are entitled to pass or fail with at least the same amount of money as their competitors. . . ."); Minow, *supra,* 28 *Harv. J. on Legisl.* at 398–99. CEIFA, without adequate funding, essentially does nothing more than tell the SNDs to reorganize (and thus become more efficient, like the model) and to achieve at higher levels (even

though they have been failing abysmally), with either the same amount of money or less than they had before.[33]

The parity remedy is one that will in all likelihood become obsolete. It can, therefore, be understood to be in the nature of provisional or interim relief. We have assumed, and anticipate, that parity will be displaced as a remedial measure in achieving a constitutional education. We acknowledged in *Abbott* II, *supra,* that the Legislature may choose "to equalize expenditures per pupil for all districts in the State at any level that it believes will achieve a thorough and efficient education, and that level need not necessarily be today's average of the affluent suburban districts." 119 *N.J.* at 387, 575 *A.*2d 359; *see supra* at 156–157, 693 *A.*2d at 422–423. Thus, if it can be convincingly demonstrated under CEIFA or by amendatory legislation or administrative regulation that a substantive thorough and efficient education can be achieved in the SNDs by expenditures that are lower than parity with the most successful districts, that would effectively moot parity as a remedy. Moreover, if the State could, as implicitly authorized by CEIFA, specifically identify those elements of DFG I & J budgets that represent genuine inefficiencies or excesses and demonstrate that they are truly unnecessary to the achievement of a thorough and efficient education, as evidenced by student performance and achievement of the content standards, it then may consider those expenditures in the funding calculation.[34]

---

[33] The State concedes that under CEIFA, some of the higher-spending SNDs, such as Newark, will be required to decrease expenditures in the 1997–1998 school year.

[34] Although the State may be correct in its assertion that both the SNDs and the DFG I & J districts are inefficient as compared to an optimal measure of efficiency, *see* Department of Education, *Comparative Spending Guide* (Mar.1997) (DOE Report) (finding that approximately sixty percent of the education dollar finds its way into the classroom), the impact of inefficient spending is more acute in the SNDs both because they spend less, on average than the DFG I & J districts and because their needs are demonstrably greater.

The State, in support of its general argument that the special needs districts will have sufficient education funding under CEIFA, asserts that wasteful and inefficient spending practices in the Newark school district demonstrate that

Further, when supplemental programs in the SNDs are established, *see* discussion *infra* at 198–201, 693 *A.*2d at 443–444, and expenditures for the implementation of such programs are undertaken, those programs will in large measure become more instrumental in the achievement of a thorough and efficient education; such expenditures and efforts directed to overcome the grave disadvantages of public school children in the special needs districts will lessen the significance of the level of funding now directed to regular education.

 The State has informed us that, in the current school year, the DFG I & J districts will spend, on average, $8,181 per pupil and that the SNDs will spend between $6,751 (Pleasantville) and $9,605 (Hoboken) per pupil.[35] By the commencement of the 1997–1998 school year, the State must guarantee that each SND has the money required to spend at the DFG I & J average budgeted (as opposed to predicted) per-pupil expenditure.[36] The Court recognizes the time restraints within which the Legislature must comply with this order and has considered the appropriateness of delaying remedial relief. The Legislature has known since July 1994, when we decided *Abbott* III, that increased funding would have to be achieved by the 1997–1998 school year. That

increased funding will not translate into a thorough and efficient education. The situation in Newark does not impugn parity as a partial remedial solution, however. On the contrary, it supports the proposition, repeatedly emphasized by the Court in connection with its prior funding orders, that, as a condition for increased funding, increased monitoring and supervision of spending in the struggling districts is required.

[35] The DFG I & J districts will spend, in the aggregate, $248,152,068, or 10.65%, more for regular education than the SNDs in the current school year.

[36] The average per-pupil expenditure in the DFG I & J districts for the 1997–1998 school year is currently estimated to be $8,431.

The State has also argued that ECPA, *N.J.S.A.* 18A:7F–16, should be considered as part of the regular education budget for purposes of any parity calculation because under the QEA, State aid for kindergarten was provided as foundation aid. We consider preschool and kindergarten as supplemental programs, and any parity calculation for regular education should exclude early childhood program aid. *Abbott* II, *supra*, 119 *N.J.* at 373, 575 *A.*2d 359.

1994 order, in turn, was necessitated by the Legislature's failure to comply with our 1990 order calling for remedial relief. Thus, the State has had seven years to comply with a remedy intended to address, albeit partially, a profound deprivation that has continued for at least twenty-five years. Thus, the remedy of increased funding for educational improvement in the poor urban districts should not be delayed any further. That remedy also must be made effective. In conjunction with the increased funding herein ordered, the Commissioner shall be required forthwith to develop for each SND a program for the improvement of education at the classroom level and shall monitor, supervise, and audit expenditures for regular education in the SNDs to assure maximum educational benefits.

B.

The constitutional guarantee of a thorough and efficient education attaches to every school district, and indeed, to every individual school in the State. Of course, the right to a thorough and efficient education does not ensure that every student will succeed. It must, however, ensure that every child in New Jersey has the opportunity to achieve. As we noted in *Abbott* II, *supra,* "[i]f the claim is that these students simply cannot make it, the constitutional answer is, give them a chance." 119 *N.J.* at 375, 575 *A.*2d 359. Today, children in the SNDs are not afforded this fundamental opportunity to which they are constitutionally entitled.

In *Abbott* III, we made clear that supplemental programs are essential to remedy the constitutional deprivation. As we did in *Abbott* II, we ordered the State to identify the needs of the children in the SNDs and to determine the costs of implementing the required programs. *Abbott* III, *supra,* 136 *N.J.* at 451, 643 *A.*2d 575.

The State again has failed to conduct any study of the needs of the SNDs and the costs of implementing programs designed to meet those needs. It is therefore impossible to determine on this

record whether the amounts of aid provided by ECPA and DEPA are sufficient to meet the real needs of disadvantaged children in the SNDs. CEIFA also fails to address adequately the facilities needs of the SNDs. No one can expect disadvantaged children to achieve in school buildings that are overcrowded, outmoded, dilapidated, and often unsafe.

The supplemental programs, first considered at the advent of this generation-long litigation in *Robinson* I, *supra,* 62 *N.J.* at 520, 303 *A.*2d 273, and definitively ordered in both *Abbott* II and III, are a crucial part of the herculean reform that must be undertaken to enhance plaintiffs' educational opportunity. Without such programs, it is doubtful that the children of our inner cities ever will have the opportunity to emerge with an education that will enable them to compete and participate in society. The fact that the educational dividends derived from those programs may not be immediately apparent or easily measurable does not render them in any sense ancillary to the achievement of a thorough and efficient education. Rather, supplemental programs for disadvantaged students are the indispensable foundation of a thorough and efficient education and a fundamental prerequisite to the fulfillment of the State's constitutional obligation.

The determination of appropriate remedial relief in the critical area of the special needs of at-risk children and the programs necessary to meet those needs is both fact-sensitive and complex; it is a problem squarely within the special expertise of educators. A court alone cannot, and should not, assume the responsibility for independently making the critical educational findings and determinations that will be the basis for such relief. We can, however, provide necessary procedures and identify the parties who best may devise the educational, programmatic, and fiscal measures to be incorporated in such remedial relief. Accordingly, we remand the matter to the Superior Court to implement that aspect of the Court's remedial order.

The Superior Court, consistent with this opinion, shall direct the Commissioner to initiate a study and to prepare a report with

specific findings and recommendations covering the special needs that must be addressed to assure a thorough and efficient education to the students in the SNDs.[37] That report shall identify the additional needs of those students, specify the programs required to address those needs, determine the costs associated with each of the required programs, and set forth the Commissioner's plan for implementation of the needed programs. In addition, the Superior Court shall direct the Commissioner to consider the educational capital and facility needs of the SNDs and to determine what actions must be initiated and undertaken by the State to identify and meet those needs.

The parties shall be given the opportunity to participate in the proceedings conducted by the Commissioner and to respond to and file exceptions to the Commissioner's report prior to its submission to the Superior Court.

The Superior Court may, in addition, conduct hearings with the participation of the Commissioner and all parties. The Superior Court may appoint, with the approval of this Court, a Special Master to assist the court in all proceedings and in reaching its determinations and rendering its decision. The Superior Court, based on its review of the Commissioner's report, any additional evidence, and any findings and determinations of the Special Master, shall render a decision with its findings, conclusions, and recommendations covering the special programs that should be implemented in the special needs districts and the costs of their

---

[37] CEIFA excludes both Plainfield and Neptune from its definition of an SND. *See N.J.S.A.* 18A:7F–3 (defining "Abbott District" as one of the 28 urban districts in DFGs A & B specifically identified in *Abbott* II). *Amicus curiae* Plainfield argues that the Legislature has provided no justification for that change, that conditions in the Plainfield public schools have not improved since that district was classified as an SND, and that therefore it should be included in any remedy devised by this Court. We have specifically left it "to the Legislature, the [State] Board and the Commissioner to determine which districts are 'poorer urban districts.'" *Abbott* II, *supra*, 119 *N.J.* at 385–86, 575 *A.2d* 359. A school district that questions its classification may challenge that determination before the Commissioner. *N.J.S.A.* 18A:6–9.

implementation. That decision will be made available to all parties, and shall be reviewed by this Court.

We do not, in directing this remedial relief, invalidate or enjoin the application of the supplemental programs for the special needs districts as provided by CEIFA for the 1997–1998 school year.

## VI

Our Constitution requires that public school children be given the opportunity to receive a thorough and efficient education. That constitutional vision irrefutably presumes that every child is potentially capable of attaining his or her own place as a contributing member in society with the ability to compete effectively with other citizens and to succeed in the economy. The wisdom giving rise to that vision is that both the child and society benefit immeasurably when that potential is realized.

Our Constitution demands that every child be given an equal opportunity to meet his or her promise. CEIFA is deficient in that it does not provide adequate resources to help the most educationally deprived children to achieve that promise or to effect change in our most needy schools. Some of those school districts will receive less in the way of physical security (Trenton), and some will receive less in the way of education funding (Newark), under the new act. Students in all of those districts will continue to attend school in substandard school buildings and under appalling conditions that frustrate, undermine, and ultimately defeat education. Nothing will be done under the act to attract the most qualified teachers to those environments or to improve teaching. None of the needs-based supplemental programs that we repeatedly have ordered will be implemented, save perhaps preschool and kindergarten, by the year 2001.

It is against that backdrop, and the inescapable reality of a continuing profound constitutional deprivation that has penalized generations of children, that one must evaluate an alternative, "wait and see" approach. That approach usually is both prudent and preferred in constitutional jurisprudence, and the Court has

taken that approach in the past. *E.g., Abbott* III, *supra,* 136 *N.J.*
444, 643 *A.*2d 575; *Abbott* II, *supra,* 119 *N.J.* 287, 575 *A.*2d 359;
*Abbott* I, *supra,* 100 *N.J.* 269, 495 *A.*2d 376; *Robinson* I, *supra,* 69
*N.J.* 449, 355 *A.*2d 129. In light of the constitutional rights at
stake, the persistence and depth of the constitutional deprivation,
and in the absence of any real prospect for genuine educational
improvement in the most needy districts, that approach is no
longer an option.

Presented with no alternative remedy by either the plaintiffs or
the State, and without a realistic alternative arising out of the new
act itself, the Court must resort to judicial relief. In fashioning
that relief, the Court never has believed that equality of expendi-
tures alone will translate into an educational opportunity in Irving-
ton that is comparable to the one provided in Millburn. The
judicial funding remedy, indeed, is likely to be approaching inutili-
ty. Only comprehensive and systemic relief will bring about
enduring reform. The remedial proceedings to be conducted on
remand are a step in the remedial process that should lead
ultimately to the full realization of the constitutional educational
opportunity. Although it remains our hope that needed compre-
hensive relief eventually will come from those branches of govern-
ment more suited to the task, there can be no responsible dissent
from the position that the Court has the constitutional obligation
to do what it can to effectuate and vindicate the constitutional
rights of the school children in the poverty-stricken urban dis-
tricts.

Plaintiffs' motion is granted. The matter is remanded for
proceedings consistent with this opinion. The remedial relief here
determined shall be set forth in a separate order to be issued by
the Court. The Court shall retain jurisdiction.

GARIBALDI, J., dissenting.

Once again, this Court must determine if the State's educational
program provides a thorough and efficient system of free public
schools. The focus of our inquiry has been and still is the special

needs districts because children in those districts are not receiving the constitutionally mandated education. Based on a misinterpretation of the Education Clause of the New Jersey Constitution, the majority holds that the Comprehensive Educational Improvement and Financing Act of 1996 (CEIFA), *L.* 1996, *c.* 138 (codified at *N.J.S.A.* 18A:7F–1 to –33), is unconstitutional as applied to the special needs districts. The majority, therefore, mandates that the State make the per-pupil expenditure of each special needs district equal to that of the average expenditure of the wealthy, suburban districts.

To secure parity, the majority orders the State, by June 30, 1997, to increase aid for regular education to the special needs districts for the upcoming school year by at least $248,152,068.[1] Because the special needs and wealthy, suburban districts have yet to complete their budgets, the exact amount that will have to be allocated is currently unknown. What is known, however, is that the other two branches will have to reallocate hundreds of millions of dollars from the budget within forty-eight days. Moreover, neither the Commissioner of Education nor the local school boards of the special needs districts will be able to plan adequately for the effective disposition of such a large influx of aid in such a short period of time.

In the past, the Court used parity in funding as a factor in determining whether the education in special needs districts satisfied the Constitution because we did not possess any other criterion for defining a thorough and efficient system of education. With the enactment of CEIFA, the State has embarked on a new and creative path for defining a thorough and efficient system of free public schools. The approach taken in CEIFA places quality of education ahead of parity in funding by establishing a frame-

---

[1] $248,152,068 is the cost of securing parity for the current school year. The average per-pupil expenditure for the wealthy suburban districts is estimated to increase from $8,181 for 1996–97 to $8,431 for 1997–1998. Therefore, to achieve parity in the coming year, the State will have to provide more than $248,152,068.

work of goals and standards that *every* child in this State must meet. I find that approach to be facially constitutional.

The basic premise of CEIFA crystalizes my disagreement with the majority. The majority focuses on parity in funding whereas I believe that quality of education is the goal. Although the majority also has the children's best interests in mind, using money as a goal has and will never provide a thorough and efficient system of free public schools. State and local governments raise sufficient funds to educate the children of this State. Indeed, on average, New Jersey spends more money per child than any other state. Thus, the problem lies in the allocation, not the availability, of funds.

Since 1990, state aid to the thirty special needs districts has increased by approximately $850 million, and yet, there is scant evidence that the children have received the benefit of those expenditures. The experiment of parity in spending has failed. To continue down that path defies common sense and will not improve the education of the children in this State. By emphasizing standards, testing, and strict accountability of how funds are expended, I believe we can give children in the special needs districts a real opportunity to secure a competitive education. Parity in funding, on the other hand, has and will continue to provide those children with empty promises.

I

In assessing the constitutionality of CEIFA, as with all state legislation, the Court must presume that it is constitutional. *See, e.g., Town of Secaucus v. Hudson County Bd. of Taxation,* 133 *N.J.* 482, 492, 628 *A.*2d 288 (1993) ("[T]he court will afford every possible presumption in favor of an act of the Legislature."); *In re C.V.S. Pharmacy Wayne,* 116 *N.J.* 490, 497, 561 *A.*2d 1160 (1989) (recognizing that presumption of validity attaches to every statute), *cert. denied,* 493 *U.S.* 1045, 110 *S.Ct.* 841, 107 *L.Ed.*2d 836 (1990); *Edgewater Inv. Assocs. v. Borough of Edgewater,* 103 *N.J.*

227, 510 *A*.2d 1178 (1986) (stating that Court will declare statute void only if it is "clearly repugnant to the constitution").

With the enactment of CEIFA, the State has offered a comprehensive definition of the phrase "thorough and efficient system of free public schools." The foundation of CEIFA is the core curriculum standards, which are the substantive standards that every school district must satisfy. CEIFA outlines results that must be met in seven core academic areas: visual and performing arts, comprehensive health and physical education, language arts literacy, mathematics, science, social studies, and world languages. CEIFA also contains "cross-content workplace readiness standards," which incorporate career-planning skills, technological skills, critical-thinking skills, decision-making and problem-solving skills, self-management, and safety principles. CEIFA provides fifty-six specific curriculum standards and 880 "student progress indicators" for those seven areas.

CEIFA permits individual districts to devise their own curriculum to meet the core curriculum standards. The Department of Education is currently developing "curriculum frameworks" that are to be used as a resource when districts develop their own curriculum to meet the standards in the seven core subjects. CEIFA also mandates that students be tested at three levels: fourth grade; eighth grade; and eleventh grade.

CEIFA's next major premise is the "T & E amount," which is the amount it will cost to provide an education that satisfies the core curriculum standards. After creating a hypothetical school district to serve as a model for the State's 611 districts, the State's experts determined that it will cost $6,720 per elementary school pupil [2] to provide an education that meets the core curriculum standards. CEIFA contains a flexible amount of $336, which is to

---

[2] CEIFA accounts for the greater educational cost at the middle and high school levels by multiplying the T & E amount by 1.12 for middle schools and 1.2 for high schools. Thus, the T & E amount is greater for middle and high school students than it is for elementary school students.

be added to or subtracted from the T & E amount depending on local factors. Under CEIFA, special needs districts (SNDs) are not permitted to spend below the T & E amount. Thus, those districts will spend between $6,720 and $7,056 per pupil. CEIFA also permits school districts to spend above the T & E amount. CEIFA requires that the T & E amount be reviewed and revised biennially. As in the past, school districts will continue to finance their education budgets through a combination of state aid and revenue from property taxes.

The third component of CEIFA's regular education framework empowers the Commissioner of Education (Commissioner) to monitor the way money is spent. As the majority states: "The Commissioner may order increased expenditures, make budgetary reallocations and programmatic adjustments, and take summary actions when either a district or a particular school is failing to achieve the content standards." *Ante* at 193–194, 693 *A.*2d at 441 (citation omitted). More importantly, the Commissioner is required to perform an exacting review of an SND's budget. If he concludes that the allocation of the money in the budget will not deliver an education that allows students to meet the core curriculum standards, he must reallocate the funds so that students will receive such an education. Finally, "the [C]ommissioner shall, for any [SND], when he deems it necessary to ensure implementation of the thoroughness standards, direct additional expenditures above the T & E budget in specific accounts and for specific purposes, up to the maximum T & E budget without approval of local voters or board of school estimate, as applicable." *N.J.S.A.* 18A:7F–6(c).

## II

The Education Clause was added to the 1844 State Constitution by amendment in 1875. It was intended to "embody the principle of the 1871 statute that public education for children shall be *free.*" *Robinson v. Cahill,* 62 *N.J.* 473, 508, 303 *A.*2d 273 (1973) (*Robinson* I).

The Education Clause now provides:

The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.

[*N.J. Const.,* art. VIII, § 4, ¶ 1.] [3]

Unlike the majority, I find that the analysis of this case must begin with the interpretation of the Education Clause. Specifically, we must determine the meaning of the phrase "thorough and efficient system." The majority states without support or explanation that "[o]ur Constitution demands that every child be given an *equal* opportunity to meet his or her promise." *Ante* at 201, 693 *A.*2d at 445 (emphasis added). That statement does not appear in our Constitution.

The interpretation of the Education Clause is limited to an analysis of the plain language because "there appears to be no helpful history spelling out the intended impact of this [clause]." *Robinson* I, *supra,* 62 *N.J.* at 508, 303 *A.*2d 273. The lack of history is of no concern because "courts should look to the plain language of the education clause" as the primary factor in determining the outcome of constitutional challenges to state educational schemes. William E. Thro, *The Role of Language of the State Education Clauses in School Finance Litigation,* 79 *Educ. L. Rep.* 19, 28 (1993); *see also* William E. Thro, *Judicial Analysis During the Third Wave of School Finance Litigation: The Massachusetts Decision as a Model,* 35 *B.C. L.Rev.* 597, 605 (1994) ("[T]he court should focus on the actual language of the education clause and the way it compares to the educational provisions of other states.").

The words that do not appear in the text are the most compelling evidence of what the Education Clause means. The constitutions of some of our sister states illustrate the types of phrases that our drafters could have chosen: "high quality" public education,[4] "equality of educational opportunity is guaranteed," [5]

---

[3] The language of the Education Clause has remained substantially the same since it was amended in 1875.

[4] *Va. Const.* art. VIII, § 1; *Ill. Const.* art. X, § 1.

[5] *Mont. Const.* art. X, § 1.

"equal opportunities shall be provided for all students," [6] "nearly uniform as practicable," [7] "general and uniform system," [8] "thorough and uniform system of free public schools," [9] "uniform system," [10] "general, uniform, and thorough system of public, free common schools," [11] "adequate public education for the citizens shall be a primary obligation," [12] "adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education," [13] and "[i]t is the paramount duty of the state to make ample provision for the education of all children." [14]

The goal of interpreting the phrase, "thorough and efficient system," is to determine the quality of education that the Constitution requires. *See* Thro, *supra,* 35 *B.C. L.Rev.* at 607; Thro, *supra,* 79 *Educ. L. Rep.* at 28. State education clauses can be grouped into four categories: (1) establishing and supporting a free system of public schools; (2) imposing a minimum quality of education for public schools; (3) providing a stronger mandate than category two; and (4) mandating that education is one of the

---

[6] *N.C. Const.* art. IX, § 2.

[7] *Wis. Const.* art. X, § 3.

[8] *Ariz. Const.* art. XI, § 1; *Ind. Const.* art. VIII, § 1; *Or. Const.* art. VIII, § 3; *S.D. Const.* art. VIII, § 1.

[9] *Colo. Const.* art. IX, § 2.

[10] *Fla. Const.* art. IX, § 1; *Nev. Const.* art. XI, § 2; *N.M. Const.* art. XII, § 1; *N.D. Const.* art. VIII, § 2.

[11] *Idaho Const.* art. IX, § 1.

[12] *Ga. Const.* art. VIII, § 1, ¶ 1.

[13] *R.I. Const.* art. XII, § 1.

[14] *Wash. Const.* art. IX, § 1.

State's primary obligations. *See* Erica Black Grubb, *Breaking the Language Barrier: The Right to Bilingual Education,* 9 *Harv. C.R.-C.L. L.Rev.* 52, 66–70 (1974); Gershon M. Ratner, *A New Legal Duty for Urban Public Schools: Effective Education in Basic Skills,* 63 *Tex. L.Rev.* 777, 815–16 (1985); Thro, *supra,* 35 *B.C.L.Rev.* at 605–06; Thro, *supra,* 79 *Educ. L. Rep.* at 23–25. The "thorough and efficient" phrase falls into the second category. *See* Grubb, *supra,* 9 *Harv. C.L.-C.R. L.Rev.* at 67–68 n. 97; Ratner, *supra,* 63 *Tex.L.Rev.* at 815 n. 144; Thro, *supra,* 35 *B.C. L.Rev.* at 606 n. 57; Thro, *supra,* 79 *Educ. L. Rep.* at 23–24 n. 29.

The word "thorough" concerns the level of education, not the level of education funding. In other words, "thorough" establishes the minimum standard of substantive education that each child must receive. "Thorough" does not mean the best education, the same education, or an education equal to that found in the wealthy districts. Rather, "thorough" means that children must receive an education that will prepare them to be productive citizens and workers.

> The term "thorough," either by itself or combined with efficient or uniform, clearly suggests a school system of a specific quality. Consequently, even though some schools are quite a bit better than others, all or most schools might meet the quality standard of "thorough."
>
> [Thro, *supra,* 79 *Educ. L. Rep.* at 28.]

The word "efficient" implicates funding, but not necessarily a specific or equal level thereof. Efficiency focuses on the effectiveness with which educational resources are applied to achieve a certain result. *See* Jeffrie G. Murphy & Jules L. Coleman, *Philosophy of Law: An Introduction to Jurisprudence* 181–98 (rev. ed.1990) (defining economic concept of efficiency); *see also* Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine,* 49 *U. Chi. L.Rev.* 61, 82–83 (1982) (defining allocational efficiency in context of tort and contract law as effective use of resources). The concept of efficiency requires that educational resources be applied in a way that maximizes the potential for achieving a thorough education. More simplistically, the Constitution re-

quires that educational resources not be wasted. Waste is inefficient and therefore unconstitutional.

> The word "efficient," when standing by itself, implies that both the financial and nonfinancial resources of the entire state are utilized appropriately and, thus, a certain implied level of quality results. Thus, even though there are significant differences in quality, all or most districts might be "efficient" in their use of resources.
>
> [Thro, *supra*, 79 *Educ.L.Rep.* at 28–29.]

Thus, "thorough and efficient system" means that the State must provide resources in a manner that optimizes the chance that children will receive an education that will make them productive members of society.

### III

The core curriculum standards easily satisfy the thoroughness component of the constitutional mandate. The core curriculum standards contain 7 core academic areas, 5 cross-content workplace readiness standards, 56 specific curriculum standards, 880 student progress indicators, and testing at 3 levels. That framework ensures that students will receive a deep, diverse, and complete education that will enable them to compete in the labor market of the twenty-first century. The majority concedes on several occasions that the core curriculum standards provide the required substantive education. "[CEIFA] may someday result in the improvement of the educational opportunity available to all New Jersey public school students." *Ante* at 152, 693 *A.*2d at 420. "[T]he educational content standards prescribed by the new act are an essential component of a thorough and efficient education. . . ." *Ante* at 153, 693 *A.*2d at 421. "We do not disturb the substantive and performance educational standards." *Ante* at 153, 693 *A.*2d at 421. "We conclude that the statutory standards are consistent with the Constitution's education clause." *Ante* at 166, 693 *A.*2d at 427. "We therefore conclude that the standards are facially adequate as a reasonable legislative definition of a constitutional thorough and efficient education." *Ante* at 168, 693 *A.*2d at 428. "We endorse the legislative judgment that the act's

detailed standards embody the substantive content of a thorough and efficient education." *Ante* at 176, 693 *A*.2d at 432. Plaintiffs also do not challenge the constitutionality and validity of the core curriculum standards.

Nonetheless, the majority declares CEIFA unconstitutional because it concludes that the funding for the SNDs is inadequate to provide a thorough and efficient education. *See ante* at 153, 169, 693 *A*.2d at 421, 429. SNDs will have between $6,720 and $7,056 per elementary school pupil to deliver the core curriculum standards. The majority asserts that that range is "clearly inadequate." *Ante* at 169, 693 *A*.2d at 429. The majority relies on how much money the wealthy, suburban districts (I & J districts) spend without explaining why a thorough education cannot be delivered for a cost between $6,720 and $7,056. In fact, the 455 non-SND and non-I & J districts (middle districts) spent an average of $7,144 per pupil for the 1996–1997 school year. No one claims that the middle districts are not providing their students with a thorough and efficient education. Thus, the majority's conclusion is based on the flawed premise that a thorough and efficient education is defined only by the resources and educational programs offered by the I & J districts.

I find fault with the majority's conclusion for three reasons. First, the plain language and intent of the New Jersey Constitution do not support the majority's conclusion. *See* discussion *supra* at 206–210, 693 *A*.2d at 447–449. Second, despite its claims to the contrary, *see ante* at 174, 693 *A*.2d at 431, the majority opinion neither recognizes the statutory presumption of validity nor defers to the special expertise of the Department of Education.

We traditionally defer to administrative determinations on matters implicating the special knowledge or expertise of that administrative agency. *See, e.g., GE Solid State, Inc. v. Director, Div. of Taxation,* 132 *N.J.* 298, 306, 625 *A*.2d 468 (1993) ("Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing."); *Merin v. Maglaki,* 126 *N.J.* 430, 436–37, 599 *A*.2d 1256 (1992) ("We give substantial deference to the interpretation of the agency charged with enforcing an act. The agency's interpretation will

prevail provided it is not plainly unreasonable."); *Mayflower Secs. Co., Inc. v. Bureau of Secs.,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973) (stating that appellate review of administrative adjudications must give "due regard . . . to the agency's expertise where such expertise is a pertinent factor").

The general disagreement on the funding issue within the field of education indicates the complexity of the issue and the need to defer to the experts. A glance at the literature dealing with education funding and its impact on student achievement reveals the differing views of scholars in the field. *Compare* Eric A. Hanushek, *The Impact of Differential Expenditures on School Performance, Educ. Researcher,* May 1989, at 45, 47 (*"There is no strong or systemic relationship between school expenditures and student performance."*) *and* Eric A. Hanushek, *Money Might Matter Somewhere: A Response to Hedges, Laine, and Greenwald, Educ. Researcher,* May 1994, at 5, 6 ("The past work demonstrates that simply adding resources to districts will not ensure improvement in student performance. Even if some districts can employ resources effectively, as undoubtedly is the case, there is no assurance that overall increases in resources will lead to overall improvements.") *with* Larry V. Hedges, et al., *Does Money Matter? A Meta–Analysis of Studies of the Effects of Differential School Inputs on Student Outcomes, Educ. Researcher,* Apr. 1994, at 5, 13 (concluding that Hanushek's data "do[es] not support his conclusion that resource inputs are unrelated to outcomes," but noting "we would not argue that 'throwing money at schools' is the most efficient method of increasing educational achievement. It almost surely is not.").

In addition to widespread disagreement in the field of education, the need to fine-tune funding and program decisions on a district-by-district, school-by-school basis, underscores the need to rely on the expertise of the Department of Education. The majority misleads the reader by suggesting that the average per-pupil expenditure of the I & J districts can be a benchmark for the cost of implementing the core curriculum standards in the SNDs. For

example, such reasoning fails to address the fact that the per-pupil expenditure of a given school district is related to the number of pupils in that particular district; i.e., it fails to account for economies of scale. *See, e.g.,* National School Board Association Advocacy Office, *School finance: How and what do schools spend?* 1 (n.d.) (noting that spending tends to be highest in "the smallest school districts").

The majority recognizes that more than fifty percent of the I & J districts are fractured school districts, i.e., K–6, K–8, and 9–12. *See ante* at 171 n. 16, 693 *A*.2d at 430 n. 16 (concluding that fewer than fifty percent of I & J districts are K–12). Unquestionably, the higher cost of educating students in those districts may be tied in part to the smaller size of some of those districts. The per-pupil expenditure in the I & J districts, however, does not necessarily translate into additional programs. One wealthy district may spend less per pupil than another wealthy district but nevertheless provide more programs.

Because funding issues are unique to individual school districts, towns, and even classrooms in terms of how funds can be effectively spent to achieve a quality education, the Commissioner is in a much better position than the Court to determine the amount of funds needed to support specific programs. The judiciary neither builds schools nor operates them. As the Court stated in *Abbott v. Burke,* 100 *N.J.* 269, 495 *A*.2d 376 (1985) (*Abbott* I),

> the issues of educational quality and municipal finance may be more effectively presented, comprehended, and assessed by a tribunal with the particular training, acquired expertise, actual experience, and direct regulatory responsibility in these fields. For these reasons, the Court has repeatedly acknowledged and approved the administrative handling of educational controversies that arise in the context of constitutional and statutory litigation, including evaluation of local educational problems, design of remedial measures, and supervision of the program implementation.
>
> [*Id.* at 300, 495 *A*.2d 376 (concluding that case should be heard by administrative agency) (citations omitted).]

By concluding that the funding is inadequate, the majority refuses to defer to the Commissioner's expertise and, in fact, disputes his determination. *See, e.g., ante* at 169, 693 *A*.2d at 429

("[W]e conclude that this strategy ... is clearly inadequate...."); *ante* at 169, 693 *A*.2d at 429 (stating that CEIFA, the record, "empirical evidence," "common experience," and "intuition" do not support State's position). Yet, oddly, despite disagreeing with the Commissioner's conclusions, the majority relies in its remedy on the specialized knowledge of the Commissioner. "[W]e require that the Commissioner ... ensure that the increased funding that we have ordered today be put to optimal educational use." *Ante* at 194, 693 *A*.2d at 442; *see also ante* at 194, 693 *A*.2d at 442 ("The Commissioner may, *within his sound discretion*, direct the use of the money to hire additional teachers, to reduce class sizes, to increase program offerings, ... to provide needed school supplies, or to implement additional programs focused on achievement of the content standards.") (emphasis added).

Thus, on the one hand, the majority recognizes that the Commissioner's ability in determining the best use of educational funding far exceeds its own; but, on the other hand, the majority challenges the Commissioner's ability to determine the amount of funds necessary to provide a thorough and efficient education. If the majority finds the Commissioner incapable of determining how much funding is necessary to provide a thorough and efficient education, it is inconsistent for the majority to make the Commissioner responsible for the even more important task of ensuring that those funds reach the students.

The third reason for my disagreement with the majority's conclusion that CEIFA inadequately funds regular education is that tight control over how the money is spent is more important than absolute dollars. As stated above, efficiency means "the effectiveness with which educational resources are applied to achieve a certain result," not equal expenditures. The majority correctly states: "Inefficiency in public education has more to do with the way money is spent than the amount of money spent. Clearly the delivery of an adequate education requires efficiency in spending." *Ante* at 171, 693 *A*.2d at 430. We are continually confronted with anecdotal evidence of inefficient spending; e.g., the school custodian who receives an exorbitant salary for his

sinecure position. New Jersey spends more per capita for education than any other state in the nation, yet we never have a clear picture of how the money is used.

CEIFA authorizes and requires the Commissioner to take a greater role in monitoring how school districts allocate the funds in their education budgets. The Commissioner must scrutinize SND budgets to ensure that money is being spent in a way that will deliver the core curriculum standards. If the Commissioner concludes that an SND's budget will not deliver those standards, he has the power to reallocate money to ensure that children receive the proper education. Moreover, although section 6(c) is unclear, it seems to grant the Commissioner the power to increase an SND's per-pupil budget above the T & E amount when he finds that such an increase is necessary to implement the standards.

CEIFA's provisions for monitoring how money is spent in the SNDs provide accountability and ensure that the State will play a more active role in the development and implementation of the educational plan in those districts. Most importantly, those provisions attempt to remove the political patronage and perks that currently burden the educational system. CEIFA's funding scheme meets both prongs of the efficiency component: (1) it allocates a sufficient amount of money to deliver the core curriculum standards; and (2) it grants the Commissioner the power to monitor how the money is spent. Thus, I conclude that CEIFA efficiently delivers the core curriculum standards.

## IV

Concluding that CEIFA is facially constitutional is also consistent with the Court's prior decisions.[15] The relevant case law

---

[15] *See Robinson* I, *supra*, 62 *N.J.* 473, 303 A.2d 273; *Robinson v. Cahill*, 63 *N.J.* 196, 306 A.2d 65 (*Robinson* II), *cert. denied*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973); *Robinson v. Cahill*, 67 *N.J.* 35, 335 A.2d 6 (1975) (*Robinson* III); *Robinson v. Cahill*, 69 *N.J.* 133, 351 A.2d 713 (1975) (*Robinson* IV), *cert. denied*, 423 *U.S.* 913, 96 *S.Ct.* 217, 46 *L. Ed.*2d 141 (1975); *Robinson v. Cahill*,

begins with the Court's 1973 opinion in *Robinson* I, *supra*, where we established a benchmark against which the educational system was to be judged. We stated that "the constitutional guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market." 62 *N.J.* at 515, 303 *A.*2d 273. I continue to adhere to that definition.

Moreover, in *Robinson* I, we did not suggest that all school districts had to spend the same amount per child on education, nor did we find that equality of expenditures was a panacea, a cure-all, or constitutionally required. *Ibid.* Indeed, we explained that dollar input would be considered because "it is plainly relevant and because we have been shown no viable criterion for measuring compliance with the constitutional mandate." *Id.* at 515–16, 303 *A.*2d 273.

Before determining that an administrative law judge should consider the evidence at the heart of the controversy, the Court in *Abbott* I, *supra*, reviewed the *Robinson* litigation (I through V) and found three basic themes that emerged from the opinions in those cases: (1) "[t]he thorough and efficient education clause ... does not require the legislature to provide the same means of instruction for every child in the state"; (2) "if the State assumes the cost of providing the constitutionally mandated education, it may ... authorize local government to go further and to tax to that end"; and (3) although "plainly relevant," dollar input per student "is only one of a number of elements that must be studied in giving definition and content to the constitutional promise." 100 *N.J.* at 291–92, 495 *A.*2d 376 (citations and internal quotation marks omitted).

---

69 *N.J.* 449, 355 *A.*2d 129 (1976) (*Robinson* V); *Robinson v. Cahill*, 70 *N.J.* 155, 358 *A.*2d 457 (1976) (*Robinson* VI); *Robinson v. Cahill*, 70 *N.J.* 464, 360 *A.*2d 400 (1976) (*Robinson* VII); *Robinson v. Cahill*, 79 *N.J.* 464, 360 *A.*2d 400 (1976) (*Robinson* VIII); *Abbott* I, *supra*, 100 *N.J.* 269, 495 *A.*2d 376; *Abbott v. Burke*, 119 *N.J.* 287, 575 *A.*2d 359 (1990) (*Abbott* II); and *Abbott v. Burke*, 136 *N.J.* 444, 643 *A.*2d 575 (1994) (*Abbott* III).

Thus, a thorough and efficient school system does not mean that every child must receive the same education. Rather, all that is required is that each child receive an education that will enable him or her to compete effectively in the marketplace. If one district offers its students the opportunity to learn three languages while another district offers its students the opportunity to learn only two languages, the latter district does not necessarily fail to provide its students with a thorough and efficient education.

Moreover, since the beginning of our jurisprudence in this area, we have focused on the meaning of "thorough and efficient" rather than on equality of per-pupil expenditures. *See Robinson* V, *supra,* 69 *N.J.* at 464, 355 *A.*2d 129 (upholding 1975 Act against facial challenge because Legislature adequately set standards against which thorough and efficient education could be judged); *Robinson* I, *supra,* 62 *N.J.* at 515, 303 *A.*2d 273 (finding that "thorough" required high school education in light of legislative changes); *Landis, supra,* 57 *N.J.L.* at 512, 31 *A.* 1017 (holding that thorough and efficient education did not require high schools). Whatever thoroughness has meant, its concern has always been the level of education, not the level of educational funding.

In *Abbott* II, *supra,* we implied that equality of expenditures was not necessary: "[T]he clear import is not of a constitutional mandate governing expenditures per pupil, equal or otherwise, but a requirement of a specific substantial level of education." 119 *N.J.* at 306, 575 *A.*2d 359. Yet, we still mandated that spending per pupil between poor and affluent districts be substantially equal. *See ibid.* In essence, even though we found that disparities in school district spending were not unconstitutional *per se,* we still ordered the Legislature to equalize spending. We reaffirmed that position in *Abbott* III, *supra,* 136 *N.J.* at 454, 643 *A.*2d 575.

The internal inconsistency created by *Abbott* II and III is understandable. In those cases, the Court relied on money because it was not presented with any legislative definition of a thorough and efficient system. For example, the Quality of Education Act of 1990, *L.* 1990, *c.* 52, *N.J.S.A.* 18A:70–1 to –37

(repealed), focused on parity in per-pupil spending between the SNDs and the I & J districts. Therefore, the monetary remedy in *Abbott* III consistently followed from the insufficiencies of that Act.

This case presents a different factual setting. With CEIFA, the Legislature has created a new method for delivering a thorough and efficient system of free public schools. The confusion created by *Abbott* II and III, however, is still evident in the majority's opinion. On the one hand, the majority concedes that the core curriculum standards are thorough. *See ante* at 152, 153, 166, 167, 176, 693 *A.*2d at 420, 421, 427, 428, 432. On the other hand, the majority still mandates equivalent expenditures per pupil. That remedy is totally inconsistent with the majority's finding and places in question the majority's commitment to any remedy other than parity in funding.

## V

The majority's decision to order equal funding will create other substantial problems. There are 611 school districts in New Jersey. Assuming that twenty-eight of the districts are SNDs and 128 are I & J districts, there are 455 middle districts. Many of those middle districts do not spend as much money as the I & J districts. In fact, the 1996–1997 average per-pupil expenditure for those districts is $7,144. Thus, if we apply the majority's full parity argument, the middle districts would have to receive additional funds because they are not currently providing a thorough and efficient education. We have never held that.

Moreover, the majority's order will cause havoc in the public school systems. The majority claims that parity will "become obsolete ... [i]f it can be convincingly demonstrated under CEIFA ... that a substantive thorough and efficient education can be achieved in the SNDs by expenditures that are lower than parity with the most successful districts...." *Ante* at 196, 693 *A.*2d at 442. Based on the majority's failure in this case to defer to the Commissioner's expertise, I seriously doubt the validity of that

claim and believe that the level of funding will continue to be based on full parity with the I & J districts. That will lead to a constant state of flux because the SNDs' budgets will depend on the budgets in the I & J districts, which will likely increase every year. Therefore, every time the I & J districts increase their budgets, funding for the SNDs will have to increase because the average per-pupil expenditure for the I & J districts will have increased. From a practical perspective, the majority's remedy is unworkable. More importantly, unless the majority intends annual lawsuits for the foreseeable future, its remedy will result in a never-ending, increasing level of funding for the SNDs that is unrelated to whether the children in those districts are receiving a thorough and efficient education.

## VI

To provide for the extra needs of children in the SNDs, CEIFA proposes two initiatives: Demonstrably Effective Program Aid (DEPA), *N.J.S.A.* 18A:7F–18, and Early Childhood Program Aid (ECPA), *N.J.S.A.* 18A:7F–16. Because the majority thinks that the amount provided for those programs is inadequate and is not based on any actual study of the needs of the students in the SNDs or the costs of supplying the necessary programs, it orders the Superior Court to direct the Commissioner to initiate a study and to prepare a report with specific findings and recommendations concerning the special educational needs of the SNDs. *See ante* at 200, 693 *A.*2d at 444. That report will be submitted to the Superior Court. The parties will be permitted to file exceptions to the Commissioner's findings and recommendations. The Superior Court will have the discretion to hold a plenary hearing or appoint a Special Master to assist it in making its decision concerning the Commissioner's report. That decision will then be reviewed by this Court.

I, on the other hand, would have the Commissioner submit his report directly to this Court because directing the Commissioner to report to the Superior Court is unnecessary, will unduly

prolong the process, and will make the process more expensive and complicated. Nonetheless, this part of the majority's remedy better comports with my position that funding should follow programs.

## VII

Because the Education Clause does not require equality in per-pupil expenditures between districts, CEIFA is not facially unconstitutional. CEIFA is a laudable effort by the other branches of government to comport with the Court's directive to establish standards. CEIFA presents a "good faith" attempt on the part of the Legislature to comply with our previous decisions. The State has substantially narrowed the disparity between the SNDs and the I & J districts by increasing aid to the SNDs by approximately $850 million. That figure does not include the additional amount of approximately $138.6 million, which the State asserts will be contributed to those districts under CEIFA for the 1997–1998 school year. The State's "good faith" is also evidenced by the process surrounding CEIFA's development. The core curriculum standards and funding mechanism were the product of a lengthy and deliberate process that took over two years.

The quality of education, not parity in funding, determines whether a child is receiving a thorough and efficient education. For the first time, the State has supplied the Court with a factor other than money by which to define thorough and efficient. The core curriculum standards, the very heart of CEIFA, provide the benchmark of a thorough and efficient system of free public schools. Those standards define in detail what all children need to know to be successful citizens and workers.

The majority acknowledges that CEIFA represents "a good faith" effort to solve the school-funding problem. *See ante* at 166, 167, 693 *A.*2d at 427, 428. That conclusion conflicts with the majority's mandate that the Legislature provide hundreds of millions of dollars in additional aid for regular education by June 30. That mandate implies that CEIFA is tantamount to legisla-

tive inaction. The thoughtfulness of the legislative and executive branches in designing CEIFA deserves an equally thoughtful judicial response. Ultimately, the other two branches of government, not the judiciary, must solve the problem of how to deliver a thorough and efficient education to the children in the SNDs.

## VIII

CEIFA, unlike the majority, places the horse before the cart by linking money to specific educational standards. The needs of the children, including the children in the SNDs, must be determined according to CEIFA's core curriculum standards. To implement the core curriculum properly, money will have to be spent: better teachers will have to be trained, and better educational tools, like computers, and better facilities will have to be provided. The cost of implementing those core curriculum standards, however, rather than the amount of money spent by the wealthy districts, will drive the educational system. That procedure will allow for much greater accountability.

Actual experience might demonstrate that the Commissioner cannot fully implement the core curriculum standards in each SND. In fact, only the future can demonstrate whether the core curriculum standards will provide a thorough and efficient system of free public schools for all children. The majority's assertion that CEIFA is unconstitutional, as applied, is therefore premature.

Because of the importance to the children of the State, particularly the children in the SNDs, I would retain jurisdiction in this matter. I would give the Commissioner until the school term 1998–1999 for the substantial implementation of the core curriculum. Any earlier date is not feasible. I understand that detailed lesson plans to enable teachers to help students meet the new standards will be ready by next spring. Appropriate testing should likewise be implemented as soon as is feasible. The Commissioner's proposed regulation *N.J.A.C.* 6:19 provides that

the Commissioner can direct the full implementation or expedited implementation of ECPA. I suggest that he do so.

## IX

I recognize that the children in the SNDs have waited a long time, but increasing funding by ten percent will accomplish little. Under CEIFA, I do not expect state aid to the SNDs to decrease. The implementation of the core curriculum standards will ultimately require more aid for the SNDs than for the affluent districts because the educational needs of the children in the SNDs are greater, due in large measure to the intractable problems associated with poverty. I do not know what level of spending is optimal in the pursuit of the goal that children receive a thorough education. I know only that we have not improved learning despite a very substantial increase in aid to the SNDs. Until we target spending at particular programs, the schools will not improve. We need a result-oriented educational system. Through the implementation of the core curriculum standards, testing, and strict accountability of how funds are expended, we will go a long way toward achieving such a system.

In a perfect world, I, like the Court, would like to see every student in the SNDs have the same educational opportunities as students in the I & J districts. The majority correctly states that "there can be no responsible dissent from the position that the Court has the constitutional obligation to do what it can to effectuate and vindicate the constitutional rights of the school children in the poverty-stricken urban districts." *Ante* at 202, 693 A.2d at 445. The Constitution, however, requires only that the State maintain and support a thorough and efficient system of free public schools. The drafters of the Constitution could have provided that each child receive an "equal" education, but they did not, and the majority should not rewrite the Constitution.

CEIFA may not be perfect, but it sets us on the road to establishing a thorough and efficient public school system for every child in this State. CEIFA should be upheld because for

the first time, the driving force is educational standards, and not the further continuation of a failed scheme.

*For granting, affirmance and remanding*—Justices HANDLER, POLLOCK, O'HERN, STEIN and COLEMAN—5.

*For granting and modification*–Justice GARIBALDI–1.

## ORDER

The Supreme Court having found previously that plaintiffs have been denied their constitutional right to a thorough and efficient education, *Abbott v. Burke,* 119 *N.J.* 287, 575 *A.*2d 359 (1990) (*Abbott* II);

And the Court having found thereafter that the Legislature enacted a statute that was unconstitutional in that it failed to provide a thorough and efficient education; and having ordered that the Legislature achieve substantial equivalence, approximating one-hundred percent, in per-pupil expenditures by school year 1997–1998; and, further, having ordered that previously-ordered remedies for plaintiffs' special educational needs be implemented, *Abbott v. Burke,* 136 *N.J.* 444, 643 *A.*2d 575 (1994) (*Abbott* III);

And the Legislature having enacted the Comprehensive Educational Improvement and Financing Act of 1996, *L.* 1996, *c.* 138 (codified at *N.J.S.A.* 18A:7F–1 to –33), in response to the Court's judgment in *Abbott* III, *supra;*

And the Court in this action having found the funding provisions of the Comprehensive Educational Improvement and Financing Act unconstitutional in respect of the special needs districts; and the Court having found further that that statute fails to address adequately the special educational needs of students attending school in the special needs districts, in that the State failed to undertake the study required by our prior decisions to determine the nature and extent of those needs, and, further, failed to determine the costs associated with the programs required specifically to meet those needs; and the Court having found further

that the State's constitutional obligation includes the duty to provide adequate school facilities to students in the special needs districts, irrespective of the local district's ability to incur debt;

And the Court having determined that remedial relief is required in accordance with its opinion; and good cause appearing;

It is ORDERED that the State provide increased funding to the twenty-eight districts identified in the Comprehensive Educational Improvement and Financing Act as "Abbott districts" that will assure that each of those districts has the ability to spend an amount per pupil in the school year 1997–1998 that is equivalent to the average per-pupil expenditure in the DFG I & J districts for that year, based on actual, budgeted expenditures, by the commencement of the 1997–1998 school year; and it is further

ORDERED that the State, through the Commissioner of Education (Commissioner), manage, control, and supervise the implementation of said additional funding to assure that it will be expended and applied effectively and efficiently to further the students' ability to achieve at the level prescribed by the Core Curriculum Content Standards, as adopted by the Department of Education and incorporated by reference into the Comprehensive Educational Improvement and Financing Act; and it is further

ORDERED that the case is remanded to the Superior Court, Chancery Division, to effectuate the remedial relief ordered by the Court; and that, on remand, the Superior Court shall direct the Commissioner to:

(1) Conduct a comprehensive study of the special educational needs of students attending school in the twenty-eight Abbott districts, and specify the programs required to address those needs, which shall include, as necessary, programs in addition to those provided for in the Comprehensive Educational Improvement and Financing Act;

(2) Determine the costs of those needed programs, on a per-program and per-pupil basis, which shall include, as necessary,

costs in addition to those provided for by the Comprehensive Educational Improvement and Financing Act;

(3) Devise a plan for State or State-assisted implementation of the identified programs in each of the twenty-eight Abbott districts;

(4) Review the facilities needs of the twenty-eight Abbott districts, and provide recommendations concerning how the State should address those needs. That review shall include consideration of appropriate and alternative funding, as necessary;

(5) Provide for the participation by the parties to this action in any proceedings required to fulfill the requirements set forth by the aforementioned paragraphs (1)—(4), including opportunities to respond and to take exception to proposed specific findings, recommendations, or conclusions of the Commissioner concerning said programs and facilities needs;

(6) Prepare and submit to the court interim progress reports, as may be required by the court, and submit a final report that shall include the Commissioner's specific findings, conclusions, and recommendations, together with the responses and exceptions of the parties, as required by the aforementioned paragraphs (1)—(5); and it is further

ORDERED that the Superior Court shall be permitted to conduct proceedings to adduce additional evidence relating to said special programs and facilities needs in the Abbott districts, as required, and that the Commissioner and all parties to this action shall be permitted to participate in such proceedings; and it is further

ORDERED that the Superior Court shall be permitted, with the approval of the Supreme Court, to appoint a Special Master to assist the court with such proceedings and with the court's review of the report of the Commissioner, and to submit to the court, as may be required, a report including findings, conclusions, and recommendations for special programs and facilities needs in the Abbott districts; and it is further

ORDERED that the Superior Court shall render a decision, based on the court's review of the report submitted by the Commissioner, any report that may be submitted by the Special Master, and any additional evidence. The decision shall include the court's findings, conclusions, and recommendations, including its determination as to whether the proposals contained in the report submitted by the Commissioner satisfy the requirements of this Order, consistent with this Court's opinion in this case; and it is further

ORDERED that the Superior Court, Chancery Division, shall render its decision by December 31, 1997, and that its decision shall be then reviewed by this Court; and it is further

ORDERED that the Court retains jurisdiction.